# THOMPSON v. OKLAHOMA

No. 86–6169.   Argued November 9, 1987—Decided June 29, 1988

816

STEVENS, J., announced the judgment of the Court and delivered an opinion in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 848. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE, J., joined, *post*, p. 859. KENNEDY, J., took no part in the consideration or decision of the case.

*Harry F. Tepker, Jr.*, by appointment of the Court, 480 U. S. 929, argued the cause for petitioner. With him on the briefs was *Victor L. Streib*.

*David W. Lee* argued the cause for respondent. With him on the brief were *Robert H. Henry,* Attorney General of Oklahoma, and *William H. Luker, Susan Stewart Dickerson, Sandra D. Howard,* and *M. Caroline Emerson,* Assistant Attorneys General.*

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion in which JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join.

Petitioner was convicted of first-degree murder and sentenced to death. The principal question presented is whether the execution of that sentence would violate the constitutional prohibition against the infliction of "cruel and unusual punish-

---

*Briefs of *amici curiae* urging reversal were filed for the Child Welfare League of America et al. by *Randy Hertz* and *Martin Guggenheim;* and for the International Human Rights Law Group by *Robert H. Kapp.*

A brief of *amicus curiae* urging affirmance was filed for Kentucky et al. by *David L. Armstrong,* Attorney General of Kentucky, and *David A. Smith* and *Virgil W. Webb III,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Robert K. Corbin* of Arizona, *John Steven Clark* of Arkansas, *John J. Kelly* of Connecticut, *Charles M. Oberly* of Delaware, *Robert Butterworth* of Florida, *Jim Jones* of Idaho, *Robert T. Stephan* of Kansas, *Edwin L. Pittman* of Mississippi, *William L. Webster* of Missouri, *Mike Greely* of Montana, *Brian McKay* of Nevada, *Hal Stratton* of New Mexico, *Lacy H. Thornburg* of North Carolina, *LeRoy S. Zimmerman* of Pennsylvania, *Travis Medlock* of South Carolina, *David L. Wilkinson* of Utah, *Mary Sue Terry* of Virginia, and *Joseph B. Meyer* of Wyoming.

Briefs of *amici curiae* were filed for the American Bar Association by *Eugene C. Thomas, Andrew J. Shookhoff,* and *Steven H. Goldblatt;* for the American Society for Adolescent Psychiatry et al. by *Joseph T. McLaughlin, Jeremy G. Epstein,* and *Henry Weisburg;* for Amnesty International by *Paul L. Hoffman, Joan W. Howarth, Joan F. Hartman, Mary E. McClymont,* and *John E. Osborn;* for Defense for Children International-USA by *Anna Mamalakis Pappas;* for the National Legal Aid and Defender Association et al. by *James E. Coleman, Jr.,* and *Michael A. Mello;* and for the Office of the State Appellate Defender of Illinois by *Theodore Gottfried.*

ments"[1] because petitioner was only 15 years old at the time of his offense.

## I

Because there is no claim that the punishment would be excessive if the crime had been committed by an adult, only a brief statement of facts is necessary. In concert with three older persons, petitioner actively participated in the brutal murder of his former brother-in-law in the early morning hours of January 23, 1983. The evidence disclosed that the victim had been shot twice, and that his throat, chest, and abdomen had been cut. He also had multiple bruises and a broken leg. His body had been chained to a concrete block and thrown into a river where it remained for almost four weeks. Each of the four participants was tried separately and each was sentenced to death.

Because petitioner was a "child" as a matter of Oklahoma law,[2] the District Attorney filed a statutory petition, see Okla. Stat., Tit. 10, § 1112(b) (1981), seeking an order finding "that said child is competent and had the mental capacity to know and appreciate the wrongfulness of his [conduct]." App. 4. After a hearing, the trial court concluded "that there are virtually no *reasonable* prospects for rehabilitation of William Wayne Thompson within the juvenile system and

---

[1] The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

This proscription must be observed by the States as well as the Federal Government. See, *e. g.*, *Robinson* v. *California*, 370 U. S. 660 (1962).

[2] Oklahoma Stat., Tit. 10, § 1101(1) (Supp. 1987) provides:

" 'Child' means any person under eighteen (18) years of age, except for any person sixteen (16) or seventeen (17) years of age who is charged with murder, kidnapping for purposes of extortion, robbery with a dangerous weapon, rape in the first degree, use of a firearm or other offensive weapon while committing a felony, arson in the first degree, burglary with explosives, shooting with intent to kill, manslaughter in the first degree, or nonconsensual sodomy."

that William Wayne Thompson should be held accountable for his acts as if he were an adult and should be certified to stand trial as an adult." *Id.*, at 8 (emphasis in original).

At the guilt phase of petitioner's trial, the prosecutor introduced three color photographs showing the condition of the victim's body when it was removed from the river. Although the Court of Criminal Appeals held that the use of two of those photographs was error,[3] it concluded that the error was harmless because the evidence of petitioner's guilt was so convincing. However, the prosecutor had also used the photographs in his closing argument during the penalty phase. The Court of Criminal Appeals did not consider whether this display was proper.

At the penalty phase of the trial, the prosecutor asked the jury to find two aggravating circumstances: that the murder was especially heinous, atrocious, or cruel; and that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. The jury found the first, but not the second, and fixed petitioner's punishment at death.

The Court of Criminal Appeals affirmed the conviction and sentence, 724 P. 2d 780 (1986), citing its earlier opinion in *Eddings* v. *State*, 616 P. 2d 1159 (1980), rev'd on other grounds, 455 U. S. 104 (1982), for the proposition that "once a minor is certified to stand trial as an adult, he may also, without violating the Constitution, be punished as an adult." 724 P. 2d, at 784. We granted certiorari to consider whether a sentence of death is cruel and unusual punishment for a crime committed by a 15-year-old child, as well as whether

---

[3] "The other two color photographs . . . were gruesome. Admitting them into evidence served no purpose other than to inflame the jury. We do not understand why an experienced prosecutor would risk reversal of the whole case by introducing such ghastly, color photographs with so little probative value. We fail to see how they could possibly assist the jury in the determination of defendant's guilt. The trial court's admission of these two photographs was error." 724 P. 2d 780, 782–783 (1986).

photographic evidence that a state court deems erroneously admitted but harmless at the guilt phase nevertheless violates a capital defendant's constitutional rights by virtue of its being considered at the penalty phase. 479 U. S. 1084 (1987).

## II

The authors of the Eighth Amendment drafted a categorical prohibition against the infliction of cruel and unusual punishments, but they made no attempt to define the contours of that category. They delegated that task to future generations of judges who have been guided by the "evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion) (Warren, C. J.).[4] In performing that task the

---

[4] That Eighth Amendment jurisprudence must reflect "evolving standards of decency" was settled early this century in the case of *Weems* v. *United States*, 217 U. S. 349 (1910). The Court held that a sentence of 15 years of hard, enchained labor, plus deprivation of various civil rights and perpetual state surveillance, constituted "cruel and unusual punishment" under the Bill of Rights of the Philippines (then under United States control). Premising its opinion on the synonymity of the Philippine and United States "cruel and unusual punishments" clauses, the Court wrote:

"Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gives it birth.

"The [cruel and unusual punishments clause] in the opinion of the learned commentators may be therefore progressive, and is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Id.*, at 373–374, 378.

See also *Ollman* v. *Evans*, 242 U. S. App. D. C. 301, 326–327, 750 F. 2d 970, 995–996 (1984) (en banc) (Bork, J., concurring):

"Judges given stewardship of a constitutional provision . . . whose core is known but whose outer reach and contours are ill-defined, face the never-ending task of discerning the meaning of the provision from one case to the next. There would be little need for judges—and certainly no office for a philosophy of judging—if the boundaries of every constitutional provision were self-evident. They are not. . . . [I]t is the task of the judge in this generation to discern how the framers' values, defined in the context of the

Court has reviewed the work product of state legislatures and sentencing juries,[5] and has carefully considered the reasons why a civilized society may accept or reject the death penalty in certain types of cases. Thus, in confronting the question whether the youth of the defendant—more specifically, the fact that he was less than 16 years old at the time of his offense—is a sufficient reason for denying the State the power to sentence him to death, we first review relevant legislative enactments,[6] then refer to jury determinations,[7] and

---

world they knew, apply to the world we know. The world changes in which unchanging values find their application. . . .

    .        .        .        .

  "We must nevei hesitate to apply old values to new circumstances . . . . The important thing, the ultimate consideration, is the constitutional freedom that is given into our keeping. A judge who refuses to see new threats to an established constitutional value, and hence provides a crabbed interpretation that robs a provision of its full, fair and reasonable meaning, fails in his judicial duty."

  [5] See, *e. g.*, *Woodson* v. *North Carolina*, 428 U. S. 280, 293 (1976) (plurality opinion) (Stewart, Powell, and STEVENS, JJ.); *Coker* v. *Georgia*, 433 U. S. 584, 593–597 (1977) (plurality opinion) (WHITE, J.); *Enmund* v. *Florida*, 458 U. S. 782, 789–796 (1982); *id.*, at 814 (legislative and jury statistics important in Eighth Amendment adjudication) (O'CONNOR, J., dissenting).

  [6] See *Furman* v. *Georgia*, 408 U. S. 238, 277–279 (1972) (Court must look to objective signs of how today's society views a particular punishment) (BRENNAN, J., concurring); *Enmund* v. *Florida*, 458 U. S., at 789–793.

  [7] Our capital punishment jurisprudence has consistently recognized that contemporary standards, as reflected by the actions of legislatures and juries, provide an important measure of whether the death penalty is "cruel and unusual." Part of the rationale for this index of constitutional value lies in the very language of the construed clause: whether an action is "unusual" depends, in common usage, upon the frequency of its occurrence or the magnitude of its acceptance.

  The focus on the acceptability and regularity of the death penalty's imposition in certain kinds of cases—that is, whether imposing the sanction in such cases comports with contemporary standards of decency as reflected by legislative enactments and jury sentences—is connected to the insistence that statutes permitting its imposition channel the sentencing process toward nonarbitrary results. For both a statutory scheme that fails to guide jury discretion in a meaningful way, and a pattern of legislative en-

finally explain why these indicators of contemporary standards of decency confirm our judgment that such a young person is not capable of acting with the degree of culpability that can justify the ultimate penalty.[8]

## III

Justice Powell has repeatedly reminded us of the importance of "the experience of mankind, as well as the long history of our law, recognizing that there *are* differences which must be accommodated in determining the rights and duties of children as compared with those of adults. Examples of this distinction abound in our law: in contracts, in torts, in criminal law and procedure, in criminal sanctions and rehabilitation, and in the right to vote and to hold office." *Goss* v. *Lopez*, 419 U. S. 565, 590–591 (1975) (dissenting opinion).[9] Oklahoma recognizes this basic distinction in a number of its statutes. Thus, a minor is not eligible to vote,[10] to sit on a jury,[11] to marry without parental consent,[12] or to purchase alcohol[13] or cigarettes.[14] Like all other States, Oklahoma

actments or jury sentences revealing a lack of interest on the part of the public in sentencing certain people to death, indicate that contemporary morality is not really ready to permit the regular imposition of the harshest of sanctions in such cases.

[8] Thus, in explaining our conclusion that the death penalty may not be imposed for the crime of raping an adult woman, JUSTICE WHITE stated: "[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." *Coker* v. *Georgia*, 433 U. S., at 597.

[9] See also *New Jersey* v. *T. L. O.*, 469 U. S. 325, 350, n. 2 (1985) (Powell, J., concurring); *Burger* v. *Kemp*, 483 U. S. 776 (1987) (Powell, J., dissenting).

[10] Okla. Const., Art. 3, § 1.

[11] Okla. Stat., Tit. 38, § 28 (1981), and Okla. Const., Art. 3, § 1.

[12] Okla. Stat., Tit. 43, § 3 (1981).

[13] Okla. Stat., Tit. 21, § 1215 (1981).

[14] Okla. Stat., Tit. 21, § 1241 (Supp. 1987). Additionally, minors may not patronize bingo parlors or pool halls unless accompanied by an adult, Okla. Stat., Tit. 21, §§ 995.13, 1103 (1981), pawn property, Okla. Stat., Tit. 59, § 1511(C)(1) (1981), consent to services by health professionals for most medical care, unless married or otherwise emancipated, Okla. Stat., Tit.

has developed a juvenile justice system in which most offenders under the age of 18 are not held criminally responsible. Its statutes do provide, however, that a 16- or 17-year-old charged with murder and other serious felonies shall be considered an adult.[15] Other than the special certification procedure that was used to authorize petitioner's trial in this case "as an adult," apparently there are no Oklahoma statutes, either civil or criminal, that treat a person under 16 years of age as anything but a "child."

The line between childhood and adulthood is drawn in different ways by various States. There is, however, complete or near unanimity among all 50 States and the District of Columbia[16] in treating a person under 16 as a minor for several important purposes. In no State may a 15-year-old vote or serve on a jury.[17] Further, in all but one State a 15-year-old may not drive without parental consent,[18] and in all but four States a 15-year-old may not marry without parental consent.[19] Additionally, in those States that have legislated on the subject, no one under age 16 may purchase pornographic materials (50 States),[20] and in most States that have some form of legalized gambling, minors are not permitted to participate without parental consent (42 States).[21] Most relevant, however, is the fact that all States have enacted legislation designating the maximum age for juvenile court jurisdiction at no less than 16.[22] All of this legislation is con-

---

63, § 2602 (1981), § 2601(a) (Supp. 1987), or operate or work at a shooting gallery, Okla. Stat., Tit. 63, § 703 (1984), and may disaffirm any contract, except for "necessaries," Okla. Stat., Tit. 15, §§ 19, 20 (1981).

[15] See n. 2, *supra;* cf. *Craig* v. *Boren,* 429 U. S. 190, 197 (1976).

[16] Henceforth, the opinion will refer to the 50 States *and* the District of Columbia as "States," for sake of simplicity.

[17] See Appendices A and B, *infra.*

[18] See Appendix C, *infra.*

[19] See Appendix D, *infra.*

[20] See Appendix E, *infra.*

[21] See Appendix F, *infra.*

[22] S. Davis, Rights of Juveniles: The Juvenile Justice System, Appendix B (1987). Thus, every State has adopted "a rebuttable presumption" that

sistent with the experience of mankind, as well as the long history of our law, that the normal 15-year-old is not prepared to assume the full responsibilities of an adult.[23]

---

a person under 16 "is not mature and responsible enough to be punished as an adult," no matter how minor the offense may be. *Post*, at 859 (dissenting opinion).

[23] The law must often adjust the manner in which it affords rights to those whose status renders them unable to exercise choice freely and rationally. Children, the insane, and those who are irreversibly ill with loss of brain function, for instance, all retain "rights," to be sure, but often such rights are only meaningful as they are exercised by agents acting with the best interests of their principals in mind. See Garvey, Freedom and Choice in Constitutional Law, 94 Harv. L. Rev. 1756 (1981). It is in this way that paternalism bears a beneficent face, paternalism in the sense of a caring, nurturing parent making decisions on behalf of a child who is not quite ready to take on the fully rational and considered task of shaping his or her own life. The assemblage of statutes in the text above, from both Oklahoma and other States, reflects this basic assumption that our society makes about children as a class; we assume that they do not yet act as adults do, and thus we act in their interest by restricting certain choices that we feel they are not yet ready to make with full benefit of the costs and benefits attending such decisions. It would be ironic if these assumptions that we so readily make about children as a class—about their inherent difference from adults in their capacity as agents, as choosers, as shapers of their own lives—were suddenly unavailable in determining whether it is cruel and unusual to treat children the same as adults for purposes of inflicting capital punishment. Thus, informing the judgment of the Court today is the virtue of consistency, for the very assumptions we make about our children when we legislate on their behalf tells us that it is likely cruel, and certainly unusual, to impose on a child a punishment that takes as its predicate the existence of a fully rational, choosing agent, who may be deterred by the harshest of sanctions and toward whom society may legitimately take a retributive stance. As we have observed: "Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, the State must play its part as *parens patriae*." *Schall* v. *Martin*, 467 U. S. 253, 265 (1984); see also *May* v. *Anderson*, 345 U. S. 528, 536 (1953) (Frankfurter, J., concurring) ("Children have a very special place in life which law should reflect. Legal theories . . . lead to fallacious reasoning if uncritically transferred to determination of a State's duty towards children"); *Ginsberg* v. *New York*, 390 U. S. 629, 649–650 (1968) (Stewart, J., concurring in result) ("[A]t least in some precisely de-

Most state legislatures have not expressly confronted the question of establishing a minimum age for imposition of the death penalty.[21] In 14 States, capital punishment is not authorized at all,[25] and in 19 others capital punishment is au-

lineated areas, a child . . . is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees. It is only upon such a premise . . . that a State may deprive children of other rights—the right to marry, for example, or the right to vote—deprivations that would be constitutionally intolerable for adults"); *Parham* v. *J. R.,* 442 U. S. 584, 603 (1979) ("Most children, even in adolescence, simply are not able to make sound judgments concerning many decisions").

[21] Almost every State, and the Federal Government, has set a minimum age at which juveniles accused of committing serious crimes can be waived from juvenile court into criminal court. See Davis, *supra,* n. 22; 18 U. S. C. § 5032 (1982 ed., Supp IV). The dissent's focus on the presence of these waiver ages in jurisdictions that retain the death penalty but that have not expressly set a minimum age for the death sentence, see *post,* at 867–868, distorts what is truly at issue in this case. Consider the following example: The States of Michigan, Oregon, and Virginia have all determined that a 15-year-old may be waived from juvenile to criminal court when charged with first-degree murder. See Mich. Comp. Laws § 712A.4(1) (1979); Ore. Rev. Stat. §§ 419.533(1)(a), (1)(b), (3) (1987); Va. Code § 16.1–269(A) (1988). However, in Michigan, that 15-year-old may not be executed—because the State has abolished the death penalty—and, in Oregon, that 15-year-old may not be executed—because the State has expressly set a minimum age of 18 for executions—but, in Virginia, that 15-year-old may be executed—because the State has a death penalty and has not expressly addressed the issue of minimum age for execution. That these three States have all set a 15-year-old waiver floor for first-degree murder tells us that the States consider 15-year-olds to be old enough to be tried in criminal court for serious crimes (or too old to be dealt with effectively in juvenile court), *but tells us nothing about the judgment these States have made regarding the appropriate punishment for such youthful offenders.* As a matter of fact, many States in the Union have waiver ages below 16, including many of the States that have either abolished the death penalty or that have set an express minimum age for the death penalty at 16 or higher. See Davis, *supra,* n. 22. In sum, we believe that the more appropriate measures for determining how the States view the issue of minimum age for the death penalty are those discussed in the text and in n. 29, *infra.*

[25] Alaska (Territory of Alaska, Session Laws, 1957, ch. 132, 23d Sess., an Act abolishing the death penalty for the commission of any crime; see Alaska Stat. Ann. § 12.55.015 (1987), "Authorized sentences" do not in-

thorized but no minimum age is expressly stated in the death penalty statute.[26]   One might argue on the basis of this body of legislation that there is no chronological age at which the

---

clude the death penalty; § 12.55.125, "Sentences of imprisonment for felonies" do not include the death penalty); District of Columbia (*United States* v. *Lee*, 160 U. S. App. D. C. 118, 122–123, 489 F. 2d 1242, 1246–1247 (1973), death penalty unconstitutional in light of *Furman* v. *Georgia*, 408 U. S. 238 (1972); see D. C. Code § 22–2404 (1981), penalty for first-degree murder does not include death); Hawaii (Territory of Hawaii, Regular Session Laws, 1957, Act 282, 28th Leg., an Act relating to the abolishment of capital punishment; see Hawaii Rev. Stat., § 706–656 (Supp. 1987), sentence for offense of murder does not include death penalty); Iowa (1965 Iowa Acts, ch. 435, Death Penalty Abolished; see Iowa Code § 902.1 (1987), penalties for Class A felonies do not include death); Kansas (*State* v. *Randol*, 212 Kan. 461, 471, 513 P. 2d 248, 256 (1973), death penalty unconstitutional after *Furman* v. *Georgia*, *supra;* death penalty still on books, Kan. Stat. Ann. §§ 22–4001—22–4014 (1981); but see § 21–3401, first-degree murder is a Class A felony, and § 21–4501(a), sentence for a Class A felony does not include death penalty); Maine (1887 Maine Acts, ch. 133, an Act to abolish the death penalty; see Me. Rev. Stat. Ann., Tit. 17–A, §§ 1251, 1152 (1983 and Supp. 1987–1988), authorized sentences for murder do not include death penalty); Massachusetts (*Commonwealth* v. *Colon-Cruz*, 393 Mass. 150, 470 N. E. 2d 116 (1984), death penalty statute violates State Constitution; death penalty law still on books, Mass. Gen. Laws §§ 279:57—279:71 (1986)); Michigan (Const., Art. 4, § 46, "No law shall be enacted providing for the penalty of death"; see Mich. Comp. Laws § 750.316 (Supp. 1988–1989), no death penalty provided for first-degree murder); Minnesota (1911 Minn. Laws, ch. 387, providing for life imprisonment and not death as sentence; see Minn. Stat. § 609.10 (1986), sentences available do not include death penalty, and § 609.185, sentence for first-degree murder is life imprisonment); New York (*People* v. *Smith*, 63 N. Y. 2d 41, 70–79, 468 N. E. 2d 879, 893–899 (1984), mandatory death penalty for first-degree murder while serving a sentence of life imprisonment unconstitutional after *Woodson* v. *North Carolina*, 428 U. S. 280 (1976), thus invalidating remainder of New York's death penalty statute; death penalty still on books, N. Y. Penal Law § 60.06 (McKinney 1987), providing for death penalty for first-degree murder); North Dakota (N. D. Cent. Code, ch. 12–50 (1985), "The Death Sentence and Execution Thereof," repealed by 1973 N. D. Laws, ch. 116, § 41, effective July 1, 1975); Rhode Island (*State* v. *Cline*, 121 R. I. 299, 397 A. 2d 1309 (1979), mandatory death penalty for any prisoner unconstitutional after *Woodson* v. *North Caro-*

imposition of the death penalty is unconstitutional and that our current standards of decency would still tolerate the execution of 10-year-old children.[27]   We think it self-evident that such an argument is unacceptable; indeed, no such argument has been advanced in this case.[28]   If, therefore, we accept the

---

*lina, supra;* see R. I. Gen. Laws § 11–23–2 (Supp. 1987), penalties for murder do not include death); West Virginia (W. Va. Code § 61–11–2 (1984), "Capital punishment abolished"); Wisconsin (1853 Wis. Laws, ch. 103, "An act to provide for the punishment of murder in the first degree, and to abolish the penalty of death"; see Wis. Stat. §§ 939.50(3)(a), 940.01 (1985–1986), first-degree murder is a Class A felony, and the penalty for such felonies is life imprisonment).

[26] Alabama (see Ala. Code §§ 13A–5–39 — 13A–5–59, 13A–6–2 (1982 and Supp. 1987)); Arizona (see Ariz. Rev. Stat. Ann. §§ 13–703 — 13–706, 13–1105 (1978 and Supp. 1987)); Arkansas (see Ark. Code Ann. §§ 5–4–104(b), 5–4–601 — 5–4–617, 5–10–101, 5–51–201 (1987 and Supp. 1987)); Delaware (see Del. Code Ann., Tit. 11, §§ 636, 4209 (1987)); Florida (see Fla. Stat. §§ 775.082, 782.04(1), 921.141 (1987)); Idaho (see Idaho Code §§ 18–4001 — 18–4004, 19–2515 (1987)); Louisiana (see La. Rev. Stat. Ann. §§ 14:30(C), 14:113 (West 1986); La. Code Crim. Proc. Ann., Art. 905 *et seq.* (West 1984 and Supp. 1988)); Mississippi (see Miss. Code Ann. §§ 97–3–21, 97–7–67, 99–19–101 — 99–19–107 (Supp. 1987)); Missouri (see Mo. Rev. Stat. §§ 565.020, 565.030–565.040 (1986)); Montana (see Mont. Code Ann. §§ 45–5–102, 46–18–301 — 46–18–310 (1987)); Oklahoma (see Okla. Stat., Tit. 21, §§ 701.10–701.15 (1981 and Supp. 1987)); Pennsylvania (see Pa. Cons. Stat., Tit. 18, § 1102(a), Tit. 42, § 9711 (1982 and Supp. 1987)); South Carolina (see S. C. Code §§ 16–3–10, 16–3–20 (1985 and Supp. 1987)); South Dakota (see S. D. Codified Laws §§ 22–16–4, 22–16–12, 23A–27A–1 — 23A–27A–41 (1988)); Utah (see Utah Code Ann. §§ 76–3–206, 76–3–207 (1978 and Supp. 1987)); Vermont (see Vt. Stat. Ann., Tit. 13, §§ 2303, 2403, 7101–7107 (1974 and Supp. 1987)); Virginia (see Va. Code §§ 18.2–31 (1988), 19.2–264.2 — 19.2–264.5 (1983 and Supp. 1987)); Washington (see Wash. Rev. Code §§ 10.95.010 — 10.95.900 (1987)); Wyoming (see Wyo. Stat. §§ 6–2–101 — 6–2–103 (1988)).

[27] It is reported that a 10-year-old black child was hanged in Louisiana in 1855 and a Cherokee Indian child of the same age was hanged in Arkansas in 1885.   See Streib, Death Penalty for Children: The American Experience with Capital Punishment for Crimes Committed While under Age Eighteen, 36 Okla. L. Rev. 613, 619–620 (1983).

[28] See Tr. of Oral Arg. 31 (respondent suggests a minimum age of 14); *post,* at 872 (dissent agrees that some line exists); *post,* at 848 (concurrence similarly agrees).

premise that some offenders are simply too young to be put to death, it is reasonable to put this group of statutes to one side because they do not focus on the question of where the chronological age line should be drawn.[29] When we confine our attention to the 18 States that have expressly established a minimum age in their death penalty statutes, we find that all of them require that the defendant have attained at least the age of 16 at the time of the capital offense.[30]

---

[29] One might argue, of course, that petitioner's execution "could theoretically be imposed" in 19 States, see *post*, at 864 (dissenting opinion), just as execution was *permissible* above the age of 7 in Blackstone's time. *Ibid.* This argument would, though, first have to acknowledge that the execution would be *impermissible* in 32 States. Additionally, 2 of the 19 States that retain a death penalty without setting a minimum age simply do not sentence people to death anymore. Neither South Dakota nor Vermont has imposed a death sentence since our landmark decision in *Furman* v. *Georgia*, 408 U. S. 238 (1972). See Greenberg, Capital Punishment as a System, 91 Yale L. J. 908, 929–936 (1982); NAACP Legal Defense and Educational Fund, Inc., Death Row, U. S. A. (1980–1987). (Vermont is frequently counted as a 15th State without a death penalty, since its capital punishment scheme fails to guide jury discretion, see Vt. Stat. Ann., Tit. 13, §§ 7101–7107 (1974), and has not been amended since our decision in *Furman* v. *Georgia*, *supra*, holding similar statutes unconstitutional. South Dakota's statute does provide for jury consideration of aggravating and mitigating factors. See S. D. Codified Laws, ch. 23A–27A (1988)). Thus, if one were to shift the focus from those States that have expressly dealt with the issue of minimum age and toward a general comparison of States whose statutes, facially, would and would not permit petitioner's execution, one would have to acknowledge a 2-to-1 ratio of States in which it is not even "theoretically" possible that Thompson's execution could occur.

[30] California (Cal. Penal Code Ann. § 190.5 (West 1988)) (age 18); Colorado (Colo. Rev. Stat. § 16–11–103(1)(a) (1986)) (age 18); Connecticut (Conn. Gen. Stat. § 53a–46a(g)(1) (1985)) (age 18); Georgia (Ga. Code Ann. § 17–9–3 (1982)) (age 17); Illinois (Ill. Rev. Stat., ch. 38, ¶ 9–1(b) (1987)) (age 18); Indiana (Ind. Code § 35–50–2–3 (Supp. 1987)) (age 16); Kentucky (Ky. Rev. Stat. § 640.040(1) (1987)) (age 16); Maryland (Md. Ann. Code, Art. 27, § 412(f) (1988)) (age 18); Nebraska (Neb. Rev. Stat. § 28–105.01 (1985)) (age 18); Nevada (Nev. Rev. Stat. § 176.025 (1987)) (age 16); New Hampshire (N. H. Rev. Stat. Ann. § 630:5(XIII) (Supp. 1987)) (prohibiting execution of one who was a minor at time of crime) (§ 21–B:1 indicates that age 18 is age of majority, while § 630:1(V) provides that no one under age 17 shall be held culpable of a capital offense); New Jersey (N. J. Stat.

The conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community.[31]  Thus, the American Bar Association[32] and the American Law Institute[33] have formally expressed their opposition to the death penalty for juveniles.  Although the death penalty has not been entirely abolished in the United Kingdom or New Zealand (it has been abolished in Australia, except in the State of New South Wales, where it is available

Ann. §§ 2A:4A–22(a) (1987), 2C:11–3(g) (West Supp. 1988)) (age 18); New Mexico (N. M. Stat. Ann. §§ 28–6–1(A), 31–18–14(A) (1987)) (age 18); North Carolina (N. C. Gen. Stat. § 14–17 (Supp. 1987)) (age 17, except death penalty still valid for anyone who commits first-degree murder while serving prison sentence for prior murder or while on escape from such sentence); Ohio (Ohio Rev. Code Ann. § 2929.02(A) (1984)) (age 18); Oregon (Ore. Rev. Stat. §§ 161.620, 419.476(1) (1987)) (age 18); Tennessee (Tenn. Code Ann. §§ 37–1–102(3), (4), 37–1–103, 37–1–134(a)(1) (1984 and Supp. 1987)) (age 18); Texas (Tex. Penal Code Ann. § 8.07(d) (Supp. 1987–1988)) (age 17).

In addition, the Senate recently passed a bill authorizing the death penalty for certain drug-related killings, with the caveat that "[a] sentence of death shall not be carried out upon a person who is under 18 years of age at the time the crime was committed." S. 2455, 100th Cong., 2d Sess.; 134 Cong. Rec. 14118 (1988).

[31] We have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual.  See *Trop* v. *Dulles*, 356 U. S. 86, 102, and n. 35 (1958); *Coker* v. *Georgia*, 433 U. S., at 596, n. 10; *Enmund* v. *Florida*, 458 U. S., at 796–797, n. 22.

[32] *"Be It Resolved*, That the American Bar Association opposes, in principle, the imposition of capital punishment upon any person for any offense committed while under the age of eighteen (18)."  American Bar Association, Summary of Action Taken by the House of Delegates 17 (1983 Annual Meeting).

[33] "[C]ivilized societies will not tolerate the spectacle of execution of children . . . ."  American Law Institute, Model Penal Code § 210.6, commentary, p. 133 (Official Draft and Revised Comments 1980).

for treason and piracy), in neither of those countries may a juvenile be executed. The death penalty has been abolished in West Germany, France, Portugal, The Netherlands, and all of the Scandinavian countries, and is available only for exceptional crimes such as treason in Canada, Italy, Spain, and Switzerland. Juvenile executions are also prohibited in the Soviet Union.[34]

## IV

The second societal factor the Court has examined in determining the acceptability of capital punishment to the American sensibility is the behavior of juries. In fact, the infrequent and haphazard handing out of death sentences by capital juries was a prime factor underlying our judgment in Furman v. Georgia, 408 U. S. 238 (1972), that the death penalty, as then administered in unguided fashion, was unconstitutional.[35]

---

[34] All information regarding foreign death penalty laws is drawn from App. to Brief for Amnesty International as Amicus Curiae A–1—A–9, and from Death Penalty in Various Countries, prepared by members of the staff of the Law Library of the Library of Congress, January 22, 1988 (available in Clerk of Court's case file). See also Children and Young Persons Act, 1933, 23 Geo. 5, ch. 12, § 53(1), as amended by the Murder (Abolition of Death Penalty) Act 1965, §§ 1(5), 4 (abolishing death penalty for juvenile offenders in United Kingdom), reprinted in 6 Halsbury's Statutes 55–56 (4th ed. 1985); Crimes Act, 1961, § 16, in 1 Reprinted Statutes of New Zealand 650–651 (1979). In addition, three major human rights treaties explicitly prohibit juvenile death penalties. Article 6(5) of the International Covenant on Civil and Political Rights, Annex to G. A. Res. 2200, 21 U. N. GAOR Res. Supp. (No. 16) 53, U. N. Doc. A/6316 (1966) (signed but not ratified by the United States), reprinted in 6 International Legal Material 368, 370 (1967); Article 4(5) of the American Convention on Human Rights, O. A. S. Official Records, OEA/Ser.K/XVI/1.1, Doc. 65, Rev. 1, Corr. 2 (1970) (signed but not ratified by the United States), reprinted in 9 International Legal Material 673, 676 (1970); Article 68 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949, [1955] 6 U. S. T. 3516, 3560, T. I. A. S. No. 3365 (ratified by the United States).

[35] See Furman v. Georgia, 408 U. S., at 249 (rarity of a sentence leads to an inference of its arbitrary imposition) (Douglas, J., concurring); id., at

While it is not known precisely how many persons have been executed during the 20th century for crimes committed under the age of 16, a scholar has recently compiled a table revealing this number to be between 18 and 20.[36] All of these occurred during the first half of the century, with the last such execution taking place apparently in 1948.[37] In the following year this Court observed that this "whole country has traveled far from the period in which the death sentence was an automatic and commonplace result of convictions . . . ." *Williams* v. *New York*, 337 U. S. 241, 247 (1949). The road we have traveled during the past four decades—in which thousands of juries have tried murder cases—leads to the unambiguous conclusion that the imposition of the death penalty on a 15-year-old offender is now generally abhorrent to the conscience of the community.

Department of Justice statistics indicate that during the years 1982 through 1986 an average of over 16,000 persons were arrested for willful criminal homicide (murder and non-negligent manslaughter) each year. Of that group of 82,094 persons, 1,393 were sentenced to death. Only 5 of them, including the petitioner in this case, were less than 16 years old

---

274–277 (Eighth Amendment prevents arbitrary death sentences; rarity of death sentences results in an inference of arbitrariness) (BRENNAN, J., concurring); *id.*, at 299–300 (BRENNAN, J., concurring); *id.*, at 312 (rarity of imposition indicates arbitrariness; "A penalty with such negligible returns to the State would be patently excessive" and therefore violate the Eighth Amendment) (WHITE, J., concurring); *id.*, at 314 (WHITE, J., concurring); see also *Enmund* v. *Florida*, 458 U. S., at 794–796 (few juries sentence defendants to death who neither killed nor intended to kill).

[36] V. Streib, Death Penalty for Juveniles 190–208 (1987) (compiling information regarding all executions in this country from 1620 through 1986 for crimes committed while under age 18; uncertainty between 18 and 20 because of two persons executed who may have been either 15 or 16 at time of crime).

[37] Professor Streib reports that the last execution of a person for a crime committed under age 16 was on January 9, 1948, when Louisiana executed Irvin Mattio, 15 at the time of his crime. *Id.*, at 197.

at the time of the offense.[38]  Statistics of this kind can, of course, be interpreted in different ways,[39] but they do suggest that these five young offenders have received sentences that are "cruel and unusual in the same way that being struck by lightning is cruel and unusual."  *Furman* v. *Georgia*, 408 U. S., at 309 (Stewart, J., concurring).

## V

"Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty" on one such as petitioner who committed a heinous murder when he was only 15 years old.  *Enmund* v. *Florida*, 458 U. S. 782, 797 (1982).[40]  In making that judgment, we first ask whether the juvenile's culpability should be measured by the same standard as that of an adult, and then consider whether the application of the death penalty to this class of offenders "measurably contributes" to the social purposes that are served by the death penalty.  *Id.*, at 798.

---

[38] See U. S. Dept. of Justice, Uniform Crime Reports: Crime in the United States 174 (1986); *id.*, at 174 (1985); *id.*, at 172 (1984); *id.*, at 179 (1983); *id.*, at 176 (1982); U. S. Dept. of Justice, Bureau of Justice Statistics Bulletin: Capital Punishment, 1986, p. 4 (1987); *id.*, Capital Punishment 1985, p. 5 (1986); *id.*, Capital Punishment 1984, p. 6 (1985); Streib, *supra*, n. 36, at 168–169.

[39] For example, one might observe that of the 80,233 people arrested for willful criminal homicide who were over the age of 16, 1,388, or 1.7%, received the death sentence, while 5 of the 1,861, or 0.3%, of those under 16 who were arrested for willful criminal homicide received the death penalty.

[40] That the task of interpreting the great, sweeping clauses of the Constitution ultimately falls to us has been for some time an accepted principle of American jurisprudence.  See *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is").  With the Eighth Amendment, whose broad, vague terms do not yield to a mechanical parsing, the method is no different.  See, *e. g.*, *Furman* v. *Georgia*, 408 U. S., at 268–269 (BRENNAN, J., concurring); *Coker* v. *Georgia*, 433 U. S., at 598 ("We have the abiding conviction" that the death penalty is an excessive penalty for rape).

It is generally agreed "that punishment should be directly related to the personal culpability of the criminal defendant." *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring). There is also broad agreement on the proposition that adolescents as a class are less mature and responsible than adults. We stressed this difference in explaining the importance of treating the defendant's youth as a mitigating factor in capital cases:

> "But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly 'during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment' expected of adults. *Bellotti* v. *Baird*, 443 U. S. 622, 635 (1979)." *Eddings* v. *Oklahoma*, 455 U. S. 104, 115–116 (1982) (footnotes omitted).

To add further emphasis to the special mitigating force of youth, Justice Powell quoted the following passage from the 1978 Report of the Twentieth Century Fund Task Force on Sentencing Policy Toward Young Offenders:

> " '[A]dolescents, particularly in the early and middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults. Moreover, youth crime as such is not exclusively the offender's fault; offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of America's youth.' " 455 U. S., at 115, n. 11.

Thus, the Court has already endorsed the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult.[41] The basis for this conclusion is too obvious to require extended explanation.[42] Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.[43]

---

[41] "[T]he conception of criminal responsibility with which the Juvenile Court operates also provides supporting rationale for its role in crime prevention. The basic philosophy concerning this is that criminal responsibility is absent in the case of misbehaving children. . . . But, what does it mean to say that a child has no criminal responsibility? . . . One thing about this does seem clearly implied, . . . and that is an absence of the basis for adult criminal accountability—the exercise of an unfettered free will." S. Fox, The Juvenile Court: Its Context, Problems and Opportunities 11–12 (1967) (publication of the President's Commission on Law Enforcement and Administration of Justice).

[42] A report on a professional evaluation of 14 juveniles condemned to death in the United States, which was accepted for presentation to the American Academy of Child and Adolescent Psychiatry, concluded:

"Adolescence is well recognized as a time of great physiological and psychological stress. Our data indicate that, above and beyond these maturational stresses, homicidal adolescents must cope with brain dysfunction, cognitive limitations, and severe psychopathology. Moreover, they must function in families that are not merely nonsupportive but also violent and brutally abusive. These findings raise questions about the American tradition of considering adolescents to be as responsible as adults for their offenses and of sentencing them to death." Lewis, Pincus, Bard, Richardson, Prichep, Feldman, & Yeager, Neuropsychiatric, Pyschoeducational, and Family Characteristics of 14 Juveniles Condemned to Death in the United States 11 (1987).

[43] See n. 23, supra; see also, e. g., E. Erikson, Childhood and Society 261–263 (1985) ("In their search for a new sense of continuity and sameness, adolescents have to refight many of the battles of earlier years, even though to do so they must artificially appoint perfectly well-meaning peo-

"The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). In *Gregg* we concluded that as "an expression of society's moral outrage at particularly offensive conduct," retribution was not "inconsistent with our respect for the dignity of men." *Ibid.*[44] Given the lesser culpability of the juvenile

---

ple to play the roles of adversaries"); E. Erikson, Identity: Youth and Crisis 128–135 (1968) (discussing adolescence as a period of "identity confusion," during which youths are "preoccupied with what they appear to be in the eyes of others as compared with what they feel they are"); Gordon, The Tattered Cloak of Immortality, in Adolescence and Death 16, 27 (C. Corr & J. McNeil eds. 1986) ("Risk-taking with body safety is common in the adolescent years, though sky diving, car racing, excessive use of drugs and alcoholic beverages, and other similar activities may not be directly perceived as a kind of flirting with death. In fact, in many ways, this is counterphobic behavior—a challenge to death wherein each survival of risk is a victory over death"); Kastenbaum, Time and Death in Adolescence, in The Meaning of Death 99, 104 (H. Feifel ed. 1959) ("The adolescent lives in an intense present; 'now' is so real to him that past and future seem pallid by comparison. Everything that is important and valuable in life lies either in the immediate life situation or in the rather close future"); Kohlberg, The Development of Children's Orientations Toward a Moral Order, 6 Vita Humana 11, 30 (1963) (studies reveal that "large groups of moral concepts and ways of thought only attain meaning at successively advanced ages and require the extensive background of social experience and cognitive growth represented by the age factor"); Miller, Adolescent Suicide: Etiology and Treatment, 9 Adolescent Psychiatry 327, 329 (S. Feinstein, J. Looney, A. Schwartzberg, & A. Sorosky eds. 1981) (many adolescents possess a "profound conviction of their own omnipotence and immortality. Thus many adolescents may appear to be attempting suicide, but they do not really believe that death will occur"); Streib, *supra* n. 36, at 3–20, 184–189 ("The difference that separates children from adults for most purposes of the law is children's immature, undeveloped ability to reason in an adultlike manner").

[44] We have invalidated death sentences when this significant justification was absent. See *Enmund* v. *Florida*, 458 U. S., at 800–801 (death penalty for one who neither kills nor intends to kill "does not measurably contribute to the retributive end of ensuring that the criminal gets his just

offender, the teenager's capacity for growth, and society's fiduciary obligations to its children, this conclusion is simply inapplicable to the execution of a 15-year-old offender.

For such a young offender, the deterrence rationale is equally unacceptable.[45] The Department of Justice statistics indicate that about 98% of the arrests for willful homicide involved persons who were over 16 at the time of the offense.[46] Thus, excluding younger persons from the class that is eligible for the death penalty will not diminish the deterrent value of capital punishment for the vast majority of potential offenders. And even with respect to those under 16 years of age, it is obvious that the potential deterrent value of the death sentence is insignificant for two reasons. The likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent.

---

deserts"); *Ford* v. *Wainwright*, 477 U. S. 399 (1986) (unconstitutional to execute someone when he is insane, in large part because retributive value is so low).

[45] Although we have held that a legislature may base a capital punishment scheme on the goal of deterrence, some Members of the Court have expressed doubts about whether fear of death actually deters crimes in certain instances. See *Lockett* v. *Ohio*, 438 U. S. 586, 624–628 (1978) (deterrence argument unavailable for one who neither kills nor intends to kill; "doubtful" that prospect of death penalty would deter "individuals from becoming involved in ventures in which death may unintentionally result") (WHITE, J., concurring in judgment); *Spaziano* v. *Florida*, 468 U. S. 447, 480 (1984) (because of invalidation of mandatory death penalty laws and additional procedural requirements to death penalty laws in which the jury's discretion must be carefully guided, deterrence rationale now rather weak support for capital punishment) (STEVENS, J., dissenting); *Enmund* v. *Florida*, 458 U. S., at 798–800 (unlikely that prospect of death penalty will deter one who neither kills nor intends to kill) (WHITE, J.); *Furman* v. *Georgia*, 408 U. S., at 301–302 (unverifiable that the death penalty deters more effectively than life imprisonment) (BRENNAN, J., concurring); *id.*, at 345–355, and nn. 124–125 (deterrence rationale unsupported by the evidence) (MARSHALL, J., concurring).

[46] See United States Department of Justice, Uniform Crime Reports, *supra*, n. 38 (80,233 of 82,094, or 97.7%).

And, even if one posits such a cold-blooded calculation by a 15-year-old, it is fanciful to believe that he would be deterred by the knowledge that a small number of persons his age have been executed during the 20th century. In short, we are not persuaded that the imposition of the death penalty for offenses committed by persons under 16 years of age has made, or can be expected to make, any measurable contribution to the goals that capital punishment is intended to achieve. It is, therefore, "nothing more than the purpose-less and needless imposition of pain and suffering," *Coker* v. *Georgia*, 433 U. S., at 592, and thus an unconstitutional punishment.[47]

## VI

Petitioner's counsel and various *amici curiae* have asked us to "draw a line" that would prohibit the execution of any person who was under the age of 18 at the time of the offense. Our task today, however, is to decide the case before us; we do so by concluding that the Eighth and Fourteenth Amendments prohibit the execution of a person who was under 16 years of age at the time of his or her offense.[48]

The judgment of the Court of Criminal Appeals is vacated, and the case is remanded with instructions to enter an appropriate order vacating petitioner's death sentence.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

---

[47] See also *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) ("[T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering") (joint opinion of Stewart, Powell, and STEVENS, JJ.).

[48] Given the Court's disposition of the principal issue, it is unnecessary to resolve the second question presented, namely, whether photographic evidence that a state court deems erroneously admitted but harmless at the guilt phase nevertheless violates a capital defendant's constitutional rights by virtue of its being considered at the penalty phase.

## APPENDICES*

### APPENDIX A
### Right to Vote

The United States Constitution, Amendment 26, requires States to permit 18-year-olds to vote. No State has lowered its voting age below 18. The following chart assembles the various provisions from state constitutions and statutes that provide an 18-year-old voting age.

| | |
|---|---|
| Ala. | [No provisions beyond reference to U. S. Const., Amdt. 26] |
| Alaska | Alaska Const., Art. V, § 1 |
| Ariz. | Ariz. Rev. Stat. Ann. § 16–121 (Supp. 1987) |
| Ark. | Ark. Code Ann. § 7–8–401 (1987) |
| Cal. | Cal. Const., Art. 2, § 2 |
| Colo. | Colo. Rev. Stat. § 1–2–101 (1980) |
| Conn. | Conn. Const., Art. 9; Conn. Gen. Stat. § 9–12 (Supp. 1988) |
| Del. | Del. Code Ann., Tit. 15, § 1701·(1981) |
| D. C. | D. C. Code § 1–1311(b)(1) (1987) |
| Fla. | Fla. Stat. § 97.041 (1987) |
| Ga. | Ga. Code Ann. § 21–2–219 (1987) |
| Haw. | Haw. Rev. Stat. § 11–12 (1985) |
| Idaho | Idaho Code § 34–402 (Supp. 1988) |
| Ill. | Ill. Rev. Stat., ch. 46, ¶ 3–1 (1987) |
| Ind. | Ind. Code § 3–7–1–1 (Supp. 1987) |
| Iowa | Iowa Code § 47.4 (1987) |
| Kan. | Kan. Const., Art. 5, § 1 |
| Ky. | Ky. Const. § 145 |
| La. | La. Const., Art. 1, § 10; La. Rev. Stat. Ann. § 18:101(A) (West 1979) |
| Me. | Me. Rev. Stat. Ann., Tit. 21A, § 111(2) (Supp. 1987–1988) |
| Md. | Md. Ann. Code, Art. 33, § 3–4(b)(2) (1986) |
| Mass. | Mass. Gen. Laws § 51:1 (1986) |
| Mich. | Mich. Comp. Laws § 168.492 (1979) |
| Minn. | Minn. Stat. § 201.014 (1986) |
| Miss. | Miss. Const., Art. 12, § 241 |

---

*Appendices assembled with the assistance· of the Brief for the National Legal Aid and Defender Association, the National Association of Criminal Defense Lawyers, and the American Jewish Committee as *Amici Curiae.*

| | |
|---|---|
| Mo. | Mo. Const., Art. VIII, § 2 |
| Mont. | Mont. Const., Art. IV, § 2; Mont. Code Ann. § 13-1-111 (1987) |
| Neb. | Neb. Const., Art. VI, § 1; Neb. Rev. Stat. § 32-223 (1984) |
| Nev. | Nev. Rev. Stat. § 293.485 (1987) |
| N. H. | N. H. Const., Pt. 1, Art. 11 |
| N. J. | N. J. Const., Art. 2, ¶ 3 |
| N. M. | [No provisions beyond reference to U. S. Const., Amdt. 26] |
| N. Y. | N. Y. Elec. Law § 5-102 (McKinney 1978) |
| N. C. | N. C. Gen. Stat. § 163-55 (1987) |
| N. D. | N. D. Const., Art. II, § 1 |
| Ohio | Ohio Const., Art. V, § 1; Ohio Rev. Code Ann. §§ 3503.01, 3503.011 (1982) |
| Okla. | Okla. Const., Art. 3, § 1 |
| Ore. | Ore. Const., Art. II, § 2 |
| Pa. | Pa. Stat. Ann., Tit. 25, § 2811 (Purdon Supp. 1988-1889) |
| R. I. | R. I. Gen. Laws § 17-1-3 (Supp. 1987) |
| S. C. | S. C. Code § 7-5-610 (Supp. 1987) |
| S. D. | S. D. Const., Art. VII, § 2; S. D. Codified Laws § 12-3-1 (1982) |
| Tenn. | Tenn. Code Ann. § 2-2-102 (1985) |
| Tex. | Tex. Elec. Code Ann. § 11.002 (Supp. 1988) |
| Utah | Utah Code Ann. § 20-1-17 (1984) |
| Vt. | Vt. Stat. Ann., Tit. 17, § 2121 (1982) |
| Va. | Va. Const., Art. II, § 1 |
| Wash. | Wash. Const., Art. VI, § 1, Amdt. 63 |
| W. Va. | W. Va. Code § 3-1-3 (1987) |
| Wis. | Wis. Const., Art. 3, § 1; Wis. Stat. §§ 6.02, 6.05 (1985-1986) |
| Wyo. | Wyo. Stat. § 22-1-102(k) (Supp. 1988) |

APPENDIX B

Right to Serve on a Jury

In no State may anyone below the age of 18 serve on a jury. The following chart assembles the various state provisions relating to minimum age for jury service.

| | |
|---|---|
| Ala. | Ala. Code § 12-16-60(a)(1) (1986) |
| Alaska | Alaska Stat. Ann. § 09.20.010(a)(3) (Supp. 1987) |

| | |
|---|---|
| Ariz. | Ariz. Rev. Stat. Ann. § 21–301(D) (Supp. 1987) |
| Ark. | Ark. Code Ann. § 16–31–101 (1987) |
| Cal. | Cal. Civ. Proc. Code Ann. § 198(a)(1) (West Supp. 1988) |
| Colo. | Colo. Rev. Stat. § 13–71–109(2)(a) (1973) |
| Conn. | Conn. Gen. Stat. § 51–217 (Supp. 1988) |
| Del. | Del. Code Ann., Tit. 10, § 4506(b)(1) (Supp. 1986) |
| D. C. | D. C. Code § 11–1906(b)(1)(C) (Supp. 1988) |
| Fla. | Fla. Stat. § 40.01 (1987) |
| Ga. | Ga. Code Ann. § 15–12–40 (Supp. 1988) |
| Haw. | Haw. Rev. Stat. § 612–4 (1985) |
| Idaho | Idaho Code § 2–209(2)(a) (Supp. 1988) |
| Ill. | Ill. Rev. Stat., ch. 78, ¶ 2 (1987) |
| Ind. | Ind. Code § 33–4–5–2 (Supp. 1987) |
| Iowa | Iowa Code § 607A.4(1)(a) (1987) |
| Kan. | Kan. Stat. Ann. § 43–156 (1986) |
| Ky. | Ky. Rev. Stat. § 29A.080(2)(a) (1985) |
| La. | La. Code Crim. Proc. Ann., Art. 401(A)(2) (West Supp. 1988) |
| Me. | Me. Rev. Stat. Ann., Tit. 14, § 1211 (Supp. 1987–1988) |
| Md. | Md. Cts. & Jud. Proc. Code Ann. § 8–104 (1984) |
| Mass. | Mass. Gen. Laws § 234:1 (1986) |
| Mich. | Mich. Comp. Laws § 600.1307a(1)(a) (Supp. 1988–1989) |
| Minn. | Minn. Stat. § 593.41, subd. 2(2) (1986) |
| Miss. | Miss. Code Ann. § 13–5–1 (1972) |
| Mo. | Mo. Rev. Stat. § 494.010 (1986) |
| Mont. | Mont. Code Ann. § 3–15–301 (1987) |
| Neb. | Neb. Rev. Stat. § 25–1601 (1985) |
| Nev. | Nev. Rev. Stat. § 6.010 (1987) |
| N. H. | N. H. Rev. Stat. Ann. § 500–A:3 (1983) |
| N. J. | N. J. Stat. Ann. § 9:17B–1 (West Supp. 1988) |
| N. M. | N. M. Stat. Ann. § 38–5–1 (1987) |
| N. Y. | N. Y. Jud. Law § 510(2) (McKinney Supp. 1988) |
| N. C. | N. C. Gen. Stat. § 9–3 (1986) |
| N. D. | N. D. Cent. Code § 27–09.1–08(2)(b) (Supp. 1987) |
| Ohio | Ohio Rev. Code Ann. § 2313.42 (1984) |
| Okla. | Okla. Stat., Tit. 38, § 28 (1981) |
| Ore. | Ore. Rev. Stat. § 10.030(2)(c) (1987) |
| Pa. | Pa. Cons. Stat. § 4521 (1982) |
| R. I. | R. I. Gen. Laws § 9–9–1 (1985) |
| S. C. | S. C. Code § 14–7–130 (1987) |

| S. D.  | S. D. Codified Laws § 16–13–10 (1987) |
| Tenn.  | Tenn. Code Ann. § 22–1–101 (1980) |
| Tex.   | Tex. Govt. Code Ann. § 62.102 (1988) |
| Utah   | Utah Code Ann. § 78–46–7(1)(b) (1987) |
| Vt.    | Vt. Stat. Ann.—Administrative Orders and ·Rules: Qualification, List, Selection and Summoning of All Jurors—Rule 25 (1986) |
| Va.    | Va. Code § 8.01–337 (Supp. 1988) |
| Wash.  | Wash. Rev. Code § 2.36.070 (1987) |
| W. Va. | W. Va. Code § 52–1–8(b)(1) (Supp. 1988) |
| Wis.   | Wis. Stat. § 756.01 (1985–1986) |
| Wyo.   | Wyo. Stat. § 1–11–101 (1988) |

## APPENDIX C

### Right to Drive Without Parental Consent

Most States have various provisions regulating driving age, from learner's permits through driver's licenses. In all States but one, 15-year-olds either may not drive, or may drive only with parental consent or accompaniment.

| Ala.    | Ala. Code § 32–6–7(1) (1983) |
| Alaska  | Alaska Stat. Ann. § 28.15.071 (Supp. 1987) |
| Ariz.   | Ariz. Rev. Stat. Ann. § 28–413(A)(1) (Supp. 1987) |
| Ark.    | Ark. Code Ann. § 27–16–604(a)(1) (1987) |
| Cal.    | Cal. Veh. Code Ann. § 12507 (West 1987) |
| Colo.   | Colo. Rev. Stat. § 42–2–107(1) (1984) |
| Conn.   | Conn. Gen. Stat. § 14–36 (1985) |
| Del.    | Del. Code Ann., Tit. 21, § 2707 (1985) |
| D. C.   | D. C. Code § 40–301 (1981) |
| Fla.    | Fla. Stat. § 322.09 (1987) |
| Ga.     | Ga. Code Ann. § 40–5–26 (1985) |
| Haw.    | Haw. Rev. Stat. § 286–112 (1985) |
| Idaho   | Idaho Code § 49–313 (Supp. 1987) |
| Ill.    | Ill. Rev. Stat., ch. 95½, ¶ 6–103 (1987) |
| Ind.    | Ind. Code § 9–1–4–32 (1982) |
| Iowa    | Iowa Code § 321.177 (1987) |
| Kan.    | Kan. Stat. Ann. § 8–237 (1982) |
| Ky.     | Ky. Rev. Stat. Ann. § 186.470 (1980) |
| La.     | La. Rev. Stat. Ann. § 32:407 (West Supp. 1988) |
| Me.     | Me. Rev. Stat. Ann., Tit. 29, § 585 (Supp. 1987–1988) |
| Md.     | Md. Transp. Code Ann. § 16–103 (1987) |
| Mass.   | Mass. Gen. Laws § 90:8 (1986) |

| | |
|---|---|
| Mich. | Mich. Comp. Laws § 257.308 (1979) |
| Minn. | Minn. Stat. § 171.04 (1986) |
| Miss. | Miss. Code Ann. § 63–1–23 (Supp. 1987) |
| Mo. | Mo. Rev. Stat. § 302.060 (Supp. 1987) |
| Mont. | Mont. Code Ann. § 61–5–105 (1987) (15-year-olds may drive without parental consent if they pass a driver's education course) |
| Neb. | Neb. Rev. Stat. § 60–407 (1984) |
| Nev. | Nev. Rev. Stat. § 483.250 (1987) |
| N. H. | N. H. Rev. Stat. Ann. § 263:17 (Supp. 1987) |
| N. J. | N. J. Stat. Ann. § 39:3–10 (West Supp. 1988) |
| N. M. | N. M. Stat. Ann. § 66–5–11 (1984) |
| N. Y. | N. Y. Veh. & Traf. Law § 502(2) (McKinney 1986) |
| N. C. | N. C. Gen. Stat. § 20–11 (1983) |
| N. D. | N. D. Cent. Code § 39–06–08 (1987) |
| Ohio | Ohio Rev. Code Ann. § 4507.07 (Supp. 1987) |
| Okla. | Okla. Stat., Tit. 47, § 6–107 (Supp. 1987) |
| Ore. | Ore. Rev. Stat. § 807.060 (1987) |
| Pa. | Pa. Cons. Stat., § 1503 (1987) |
| R. I. | R. I. Gen. Laws § 31–10–3 (Supp. 1987) |
| S. C. | S. C. Code § 56–1–100 (1976) |
| S. D. | S. D. Codified Laws § 32–12–6 (1984) |
| Tenn. | Tenn. Code Ann. § 55–7–104 (Supp. 1987) |
| Tex. | Tex. Rev. Civ. Stat. Ann., Art. 6687b(4) (Vernon Supp. 1988) |
| Utah | Utah Code Ann. § 41–2–109 (Supp. 1987) |
| Vt. | Vt. Stat. Ann., Tit. 23, § 607 (1987) |
| Va. | Va. Code § 46.1–357 (Supp. 1988) |
| Wash. | Wash. Rev. Code § 46.20.031 (1987) |
| W. Va. | W. Va. Code § 17B–2–3 (1986) |
| Wis. | Wis. Stat. § 343.15 (1985–1986) |
| Wyo. | Wyo. Stat. § 31–7–112 (Supp. 1988) |

## APPENDIX D

### Right to Marry Without Parental Consent

In all States but four, 15-year-olds may not marry without parental consent.

| | |
|---|---|
| Ala. | Ala. Code § 30–1–5 (1983) |
| Alaska | Alaska Stat. Ann. § 25.05.171 (1983) (judge may permit minor to marry without parental consent, even in the face of parental opposition, in certain circumstances) |

844

| | |
|---|---|
| Ariz. | Ariz. Rev. Stat. Ann. § 25–102(A) (1976) |
| Ark. | Ark. Code Ann. § 9–11–102 (1987) |
| Cal. | Cal. Civ. Code Ann. § 4101 (West 1983) |
| Colo. | Colo. Rev. Stat. § 14–2–106(1)(a)(I) (1987) |
| Conn. | Conn. Gen. Stat. § 46b–30 (1986) |
| Del. | Del. Code Ann., Tit. 13, § 123 (1981) |
| D. C. | D. C. Code § 30–111 (1981) |
| Fla. | Fla. Stat. § 741.04 (1987) |
| Ga. | Ga. Code Ann. § 19–3–37 (1982) |
| Haw. | Haw. Rev. Stat. § 572–2 (1985) |
| Idaho | Idaho Code § 32–202 (1983) |
| Ill. | Ill. Rev. Stat., ch. 40, ⁋ 203(1) (1987) |
| Ind. | Ind. Code § 31–7–1–6 (Supp. 1987) |
| Iowa | Iowa Code § 595.2 (1987) |
| Kan. | Kan. Stat. Ann. § 23–106 (1981) |
| Ky. | Ky. Rev. Stat. § 402.210 (1984) |
| La. | La. Civ. Code Ann., Art. 87 (West Supp. 1988) (minors not legally prohibited from marrying, even without parental consent, but marriage ceremony required); La. Rev. Stat. Ann. § 9:211 (West Supp. 1988) (official may not perform marriage ceremony in which a minor is a party without parental consent; comments to Civ. Code Ann., Art. 87, suggest that such a marriage is valid but that official may face sanctions) |
| Me. | Me. Rev. Stat. Ann., Tit. 19, § 62 (Supp. 1987–1988) |
| Md. | Md. Fam. Law Code Ann. § 2–301 (1984) (either party under 16 may marry without parental consent if "the woman to be married . . . is pregnant or has given birth to a child") |
| Mass. | Mass. Gen. Laws § 207:7 (1988) |
| Mich. | Mich. Comp. Laws § 551.103 (1988) |
| Minn. | Minn. Stat. § 517.02 (1986) |
| Miss. | Miss. Code Ann. § 93–1–5(d) (Supp. 1987) (female may marry at 15 without parental consent) |
| Mo. | Mo. Rev. Stat. § 451.090 (1986) |
| Mont. | Mont. Code Ann. § 40–1–202 (1987) |
| Neb. | Neb. Rev. Stat. § 42–105 (1984) |
| Nev. | Nev. Rev. Stat. § 122.020 (1987) |
| N. H. | N. H. Rev. Stat. Ann. § 457:5 (1983) |
| N. J. | N. J. Stat. Ann. § 9:17B–1 (West Supp. 1988) |
| N. M. | N. M. Stat. Ann. § 40–1–6 (1986) |

| N. Y. | N. Y. Dom. Rel. Law § 15 (McKinney 1988) |
| N. C. | N. C. Gen. Stat. § 51–2 (Supp. 1987) |
| N. D. | N. D. Cent. Code § 14–03–02 (1981) |
| Ohio | Ohio Rev. Code Ann. § 3101.01 (Supp. 1987) |
| Okla. | Okla. Stat., Tit. 43, § 3 (1981) |
| Ore. | Ore. Rev. Stat. § 106.060 (1987) |
| Pa. | Pa. Stat. Ann., Tit. 48, § 1–5(c) (Purdon Supp. 1988–1989) |
| R. I. | R. I. Gen. Laws § 15–2–11 (1981) |
| S. C. | S. C. Code § 20–1–250 (1985) |
| S. D. | S. D. Codified Laws § 25–1–9 (1984) |
| Tenn. | Tenn. Code Ann. § 36–3–106 (Supp. 1987) |
| Tex. | Tex. Fam. Code Ann. § 1.51 (Supp. 1987–1988) |
| Utah | Utah Code Ann. § 30–1–9 (1984) |
| Vt. | Vt. Stat. Ann., Tit. 18, § 5142 (1987) |
| Va. | Va. Code § 20–48 (1983) |
| Wash. | Wash. Rev. Code § 26.04.210 (1987) |
| W. Va. | W. Va. Code § 48–1–1 (1986) |
| Wis. | Wis. Stat. § 765.02 (1985–1986) |
| Wyo. | Wyo. Stat. § 20–1–102 (1987) |

## Appendix E
### Right to Purchase Pornographic Materials

No minor may purchase pornography in the 50 States that have legislation dealing with obscenity.

| Ala. | Ala. Code § 13A–12–170(1) (Supp. 1987) |
| Alaska | [No legislation] |
| Ariz. | Ariz. Rev. Stat. Ann. § 13–3506 (Supp. 1987) |
| Ark. | Ark. Code Ann. §§ 5–68–501, 5–68–502 (1987) |
| Cal. | Cal. Penal Code Ann. § 313.1 (West 1988) |
| Colo. | Colo. Rev. Stat. § 18–7–502 (1986) |
| Conn. | Conn. Gen. Stat. § 53a–196 (1985) |
| Del. | Del. Code Ann., Tit. 11, § 1361(b) (1987) |
| D. C. | D. C. Code § 22–2001(b) (1981) |
| Fla. | Fla. Stat. § 847.012 (1987) |
| Ga. | Ga. Code Ann. § 16–12–103 (1984) |
| Haw. | Haw. Rev. Stat. § 712–1215 (1985) |
| Idaho | Idaho Code § 18–1513 (1987) |
| Ill. | Ill. Rev. Stat., ch. 38, ¶ 11–21 (1987) |
| Ind. | Ind. Code § 35–49–3–3 (Supp. 1987) |
| Iowa | Iowa Code § 728.2 (1987) |

Kan.    Kan. Stat. Ann. § 21–4301a (Supp. 1987)
Ky.     Ky. Rev. Stat. § 531–030 (1985)
La.     La. Rev. Stat. Ann. § 14:91.11 (West 1986)
Me.     Me. Rev. Stat. Ann., Tit. 17, § 2911 (1983 and
        Supp. 1987–1988)
Md.     Md. Ann. Code, Art. 27, § 419 (1987)
Mass.   Mass. Gen. Laws § 272:28 (1986)
Mich.   Mich. Comp. Laws § 750.142 (1979)
Minn.   Minn. Stat. § 617.293 (1986)
Miss.   Miss. Code Ann. § 97–5–27 (Supp. 1987)
Mo.     Mo. Rev. Stat. § 573.040 (Supp. 1987)
Mont.   Mont. Code Ann. § 45–8–201 (1987)
Neb.    Neb. Rev. Stat. § 28–808 (1985)
Nev.    Nev. Rev. Stat. § 201.265 (1987)
N. H.   N. H. Rev. Stat. Ann. § 571–B:2 (1986)
N. J.   N. J. Stat. Ann. §§ 2C:34–2, 2C:34–3 (West 1982 and
        Supp. 1988)
N. M.   N. M. Stat. Ann. § 30–37–2 (1980)
N. Y.   N. Y. Penal Law § 235.21 (McKinney 1980)
N. C.   N. C. Gen. Stat. § 19–13 (1983)
N. D.   N. D. Cent. Code § 12.1–27.1–03 (1985)
Ohio    Ohio Rev. Code Ann. § 2907.31 (1986)
Okla.   Okla. Stat., Tit. 21, § 1040.8 (Supp. 1987)
Ore.    Ore. Rev. Stat. § 167.065 (1987)
Pa.     Pa. Cons. Stat. § 5903 (1982)
R. I.   R. I. Gen. Laws § 11–31–10 (Supp. 1987)
S. C.   S. C. Code § 16–15–385 (Supp. 1987)
S. D.   S. D. Codified Laws § 22–24–28 (1988)
Tenn.   Tenn. Code Ann. § 39–6–1132 (1982)
Tex.    Tex. Penal Code Ann. § 43.24 (1974)
Utah    Utah Code Ann. § 76–10–1206 (1978)
Vt.     Vt. Stat. Ann., Tit. 13, § 2802 (1974)
Va.     Va. Code § 18.2–391 (1988)
Wash.   Wash. Rev. Code § 9.68.060 (1987)
W. Va.  W. Va. Code § 61–8A–2 (1984)
Wis.    Wis. Stat. § 944.21 (1985–1986)
Wyo.    Wyo. Stat. § 6–4–302 (1988)

## Appendix F
### Right to Participate in Legalized Gambling
### Without Parental Consent

In 39 of the 48 States in which some form of legalized gambling is permitted, minors are absolutely prohibited from participating in some or all forms of such gambling. In three States parental consent vitiates such prohibition; in six States, no age restrictions are expressed in the statutory provisions authorizing gambling.

Ala.      Ala. Code § 11–65–44 (1985)
Alaska    Alaska Stat. Ann. § 43.35.040(a)(1) (1983)
Ariz.     Ariz. Rev. Stat. Ann. § 5–112(E) (Supp. 1987)
Ark.      Ark. Code Ann. § 23–110–405(c) (Supp. 1987)
Cal.      Cal. Penal Code Ann. § 326.5(e) (West 1988)
Colo.     Colo. Rev. Stat. § 24–35–214(1)(c) (1982)
Conn.     Conn. Gen. Stat. § 7–186a (Supp. 1988)
Del.      Del. Code Ann., Tit. 29, § 4810(a) (1983)
D. C.     D. C. Code § 2–2534 (1988)
Fla.      Fla. Stat. § 849.093(9)(a) (1987)
Ga.       Ga. Code Ann. § 16–12–58 (1984)
Haw.      Haw. Rev. Stat. § 712–1231 (1985)
Idaho     Idaho Code § 67–7415 (Supp. 1988)
Ill.      Ill. Rev. Stat., ch. 120, ¶ 1102(9) (1988)
Ind.      [Gambling not permitted by statute]
Iowa      Iowa Code § 233.1(2)(c) (1987)
Kan.      Kan. Stat. Ann. § 79–4706(m) (1984)
Ky.       [No age restrictions]
La.       La. Rev. Stat. Ann. § 14:92(A)(4) (West 1986)
Me.       Me. Rev. Stat. Ann., Tit. 17, § 319 (1983)
Md.       [No age restrictions]
Mass.     Mass. Gen. Laws § 128A:10 (1986)
Mich.     Mich. Comp. Laws Ann. § 432.110a(a) (Supp. 1988–1989)
Minn.     [No age restrictions]
Miss.     Miss. Code Ann. § 97–33–21 (1972)
Mo.       Mo. Rev. Stat. § 313.280 (1986)
Mont.     Mont. Code Ann. § 23–5–506 (1987)
Neb.      Neb. Rev. Stat. § 9–250 (Supp. 1986)
Nev.      Nev. Rev. Stat. § 463.350 (1987)
N. H.     N. H. Rev. Stat. Ann. §§ 287–A:4, 287–E:7(III), and
          287–E:21(V) (1987)

| | |
|---|---|
| N. J. | N. J. Stat. Ann. § 9:17B–1 (West Supp. 1988) |
| N. M. | [No age restrictions] |
| N. Y. | N. Y. Tax Law § 1610 (McKinney 1987) |
| N. C. | [No age restrictions] |
| N. D. | N. D. Cent. Code § 53–06.1–07.1 (Supp. 1987) |
| Ohio | Ohio Rev. Code Ann. § 3770.07 (Supp. 1987) |
| Okla. | Okla. Stat., Tit. 21, § 995.13 (1981) (permitted with parental consent) |
| Ore. | Ore. Rev. Stat. § 163.575(1)(c) (1987) |
| Pa. | Pa. Stat. Ann., Tit. 10, § 305 (Purdon Supp. 1988–1989) (permitted with parental consent) |
| R. I. | R. I. Gen. Laws § 11–19–32(*l*) (Supp. 1987) |
| S. C. | [Gambling not permitted by statute] |
| S. D. | S. D. Codified Laws § 42–7A–32 (Supp. 1988) |
| Tenn. | Tenn. Code Ann. § 39–6–609(f) (Supp. 1987) |
| Tex. | Tex. Rev. Civ. Stat. Ann., Art. 179d, § 17 (Vernon Supp. 1987–1988) (permitted with parental consent) |
| Utah | [Gambling not permitted by statute] |
| Vt. | Vt. Stat. Ann., Tit. 31, § 674(J) (1986) |
| Va. | [No age restrictions] |
| Wash. | Wash. Rev. Code § 67.70.120 (1987) |
| W. Va. | W. Va. Code § 19–23–9(e) (Supp. 1988) |
| Wis. | Wis. Stat. § 163.51(13) (1985–1986) |
| Wyo. | Wyo. Stat. § 11–25–109(c) (Supp. 1988) |

JUSTICE O'CONNOR, concurring in the judgment.

The plurality and dissent agree on two fundamental propositions: that there is some age below which a juvenile's crimes can never be constitutionally punished by death, and that our precedents require us to locate this age in light of the " 'evolving standards of decency that mark the progress of a maturing society.' " See *ante*, at 821 (quoting *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (opinion of Warren, C. J.)); *ante*, at 827–829; *post*, at 864–865, 872. See also, *e. g.*, *McCleskey* v. *Kemp*, 481 U. S. 279, 300 (1987). I accept both principles. The disagreements between the plurality and the dissent rest on their different evaluations of the evidence available to us about the relevant social consensus. Although I believe that a national consensus forbidding the execution of any person

for a crime committed before the age of 16 very likely does exist, I am reluctant to adopt this conclusion as a matter of constitutional law without better evidence than we now possess. Because I conclude that the sentence in this case can and should be set aside on narrower grounds than those adopted by the plurality, and because the grounds on which I rest should allow us to face the more general question when better evidence is available, I concur only in the judgment of the Court.

I

Both the plurality and the dissent look initially to the decisions of American legislatures for signs of a national consensus about the minimum age at which a juvenile's crimes may lead to capital punishment. Although I agree with the dissent's contention, *post*, at 865, that these decisions should provide the most reliable signs of a society-wide consensus on this issue, I cannot agree with the dissent's interpretation of the evidence.

The most salient statistic that bears on this case is that every single American legislature that has expressly set a minimum age for capital punishment has set that age at 16 or above. See *ante*, at 829, and n. 30. When one adds these 18 States to the 14 that have rejected capital punishment completely, see *ante*, at 826, and n. 25, it appears that almost two-thirds of the state legislatures have definitely concluded that no 15-year-old should be exposed to the threat of execution. See also *ante*, at 829, n. 29 (pointing out that an additional two States with death penalty statutes on their books seem to have abandoned capital punishment in practice). Where such a large majority of the state legislatures have unambiguously outlawed capital punishment for 15-year-olds, and where no legislature in this country has affirmatively and unequivocally endorsed such a practice, strong counterevidence would be required to persuade me that a national consensus against this practice does not exist.

The dissent argues that it has found such counterevidence in the laws of the 19 States that authorize capital punishment without setting any statutory minimum age. If we could be sure that each of these 19 state legislatures had deliberately chosen to authorize capital punishment for crimes committed at the age of 15, one could hardly suppose that there is a settled national consensus opposing such a practice. In fact, however, the statistics relied on by the dissent may be quite misleading. When a legislature provides for some 15-year-olds to be processed through the adult criminal justice system, and capital punishment is available for adults in that jurisdiction, the death penalty becomes at least theoretically applicable to such defendants. This is how petitioner was rendered death eligible, and the same possibility appears to exist in 18 other States. See *post*, at 861–862; *ante*, at 828, n. 26. As the plurality points out, however, it does not necessarily follow that the legislatures in those jurisdictions have deliberately concluded that it would be appropriate to impose capital punishment on 15-year-olds (or on even younger defendants who may be tried as adults in some jurisdictions). See *ante*, at 826, n. 24.

There are many reasons, having nothing whatsoever to do with capital punishment, that might motivate a legislature to provide as a general matter for some 15-year-olds to be channeled into the adult criminal justice process. The length or conditions of confinement available in the juvenile system, for example, might be considered inappropriate for serious crimes or for some recidivists. Similarly, a state legislature might conclude that very dangerous individuals, whatever their age, should not be confined in the same facility with more vulnerable juvenile offenders. Such reasons would suggest nothing about the appropriateness of capital punishment for 15-year-olds. The absence of any such implication is illustrated by the very States that the dissent cites as evidence of a trend toward lowering the age at which juveniles may be punished as adults. See *post*, at 867, and n. 3. New York,

which recently adopted legislation allowing juveniles as young as 13 to be tried as adults, does not authorize capital punishment under any circumstances. In New Jersey, which now permits some 14-year-olds to be tried as adults, the minimum age for capital punishment is 18. In both cases, therefore, the decisions to lower the age at which some juveniles may be treated as adults must have been based on reasons quite separate from the legislatures' views about the minimum age at which a crime should render a juvenile eligible for the death penalty.

Nor have we been shown evidence that other legislatures directly considered the fact that the interaction between their capital punishment statutes and their juvenile offender statutes could in theory lead to executions for crimes committed before the age of 16. The very real possibility that this result was not considered is illustrated by the recent federal legislation, cited by the dissent, which lowers to 15 the age at which a defendant may be tried as an adult. See *post*, at 865 (discussing Comprehensive Crime Control Act of 1984, Pub. L. 98–473, 98 Stat. 2149). Because a number of federal statutes have long provided for capital punishment, see *post*, at 866, n. 1, this legislation appears to imply that 15-year-olds may now be rendered death eligible under federal law. The dissent does not point to any legislative history suggesting that Congress considered this implication when it enacted the Comprehensive Crime Control Act. The apparent absence of such legislative history is especially striking in light of the fact that the United States has agreed by treaty to set a minimum age of 18 for capital punishment in certain circumstances. See Article 68 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, August 12, 1949, [1955] 6 U. S. T. 3516, 3560, T. I. A. S. No. 3365 (rules pertaining to military occupation); *ante*, at 831, n. 34; see also *ibid.* (citing two other international agreements, signed but not ratified by the United States, prohibiting capital punishment for juveniles). Perhaps even more striking is

the fact that the United States Senate recently passed a bill authorizing capital punishment for certain drug offenses, but prohibiting application of this penalty to persons below the age of 18 at the time of the crime. 134 Cong. Rec. 14117, 14118 (1988). Whatever other implications the ratification of Article 68 of the Geneva Convention may have, and whatever effects the Senate's recent action may eventually have, both tend to undercut any assumption that the Comprehensive Crime Control Act signals a decision by Congress to authorize the death penalty for some 15-year-old felons.

Thus, there is no indication that any legislative body in this country has rendered a considered judgment approving the imposition of capital punishment on juveniles who were below the age of 16 at the time of the offense. It nonetheless is true, although I think the dissent has overstated its significance, that the Federal Government and 19 States have adopted statutes that appear to have the legal effect of rendering some of these juveniles death eligible. That fact is a real obstacle in the way of concluding that a national consensus forbids this practice. It is appropriate, therefore, to examine other evidence that might indicate whether or not these statutes are inconsistent with settled notions of decency in our society.

In previous cases, we have examined execution statistics, as well as data about jury determinations, in an effort to discern whether the application of capital punishment to certain classes of defendants has been so aberrational that it can be considered unacceptable in our society. See, e. g., Coker v. Georgia, 433 U. S. 584, 592 (1977) (plurality opinion); Enmund v. Florida, 458 U. S. 782, 794–796 (1982); id., at 818–819 (O'CONNOR, J., dissenting). In this case, the plurality emphasizes that four decades have gone by since the last execution of a defendant who was younger than 16 at the time of the offense, and that only 5 out of 1,393 death sentences during a recent 5-year period involved such defendants.

*Ante,* at 832–833. Like the statistics about the behavior of legislatures, these execution and sentencing statistics support the inference of a national consensus opposing the death penalty for 15-year-olds, but they are not dispositive.

A variety of factors, having little or nothing to do with any individual's blameworthiness, may cause some groups in our population to commit capital crimes at a much lower rate than other groups. The statistics relied on by the plurality, moreover, do not indicate how many juries have been asked to impose the death penalty for crimes committed below the age of 16, or how many times prosecutors have exercised their discretion to refrain from seeking the death penalty in cases where the statutory prerequisites might have been proved. Without such data, raw execution and sentencing statistics cannot allow us reliably to infer that juries are or would be significantly more reluctant to impose the death penalty on 15-year-olds than on similarly situated older defendants.

Nor, finally, do I believe that this case can be resolved through the kind of disproportionality analysis employed in Part V of the plurality opinion. I agree that "proportionality requires a nexus between the punishment imposed and the defendant's blameworthiness." *Enmund, supra,* at 825 (O'CONNOR, J., dissenting); see also *Tison* v. *Arizona,* 481 U. S. 137 (1987). Granting the plurality's other premise—that adolescents are generally less blameworthy than adults who commit similar crimes—it does not necessarily follow that all 15-year-olds are incapable of the moral culpability that would justify the imposition of capital punishment. Nor has the plurality educed evidence demonstrating that 15-year-olds as a class are inherently incapable of being deterred from major crimes by the prospect of the death penalty.

Legislatures recognize the relative immaturity of adolescents, and we have often permitted them to define age-based classes that take account of this qualitative difference between juveniles and adults. See, *e. g., Hazelwood School*

*District* v. *Kuhlmeier*, 484 U. S. 260 (1988); *Schall* v. *Martin*, 467 U. S. 253 (1984); *McKeiver* v. *Pennsylvania*, 403 U. S. 528 (1971); *Ginsberg* v. *New York*, 390 U. S. 629 (1968). But compare *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 74–75 (1976) (unconstitutional for a legislature to presume that all minors are incapable of providing informed consent to abortion), and *Bellotti* v. *Baird*, 443 U. S. 622, 654 (1979) (STEVENS, J., joined by BRENNAN, MARSHALL, and BLACKMUN, JJ., concurring in judgment) (same), with *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 469, n. 12 (1983) (O'CONNOR, J., dissenting) (parental notification requirements may be constitutional). The special qualitative characteristics of juveniles that justify legislatures in treating them differently from adults for many other purposes are also relevant to Eighth Amendment proportionality analysis. These characteristics, however, vary widely among different individuals of the same age, and I would not substitute our inevitably subjective judgment about the best age at which to draw a line in the capital punishment context for the judgments of the Nation's legislatures. Cf. *Enmund, supra,* at 826, and n. 42 (O'CONNOR, J., dissenting).

The history of the death penalty instructs that there is danger in inferring a settled societal consensus from statistics like those relied on in this case. In 1846, Michigan became the first State to abolish the death penalty for all crimes except treason, and Rhode Island soon thereafter became the first jurisdiction to abolish capital punishment completely. F. Zimring & G. Hawkins, Capital Punishment and the American Agenda 28 (1986). In succeeding decades, other American States continued the trend towards abolition, especially during the years just before and during World War I. *Id.,* at 28–29. Later, and particularly after World War II, there ensued a steady and dramatic decline in executions—both in absolute terms and in relation to the number of homicides occurring in the country. W. Bowers, Legal Homicide

26–28 (1984). In the 1950's and 1960's, more States abolished or radically restricted capital punishment, and executions ceased completely for several years beginning in 1968. H. Bedau, The Death Penalty in America 23, 25 (3d ed. 1982).

In 1972, when this Court heard arguments on the constitutionality of the death penalty, such statistics might have suggested that the practice had become a relic, implicitly rejected by a new societal consensus. Indeed, counsel urged the Court to conclude that "the number of cases in which the death penalty is imposed, as compared with the number of cases in which it is statutorily available, reflects a general revulsion toward the penalty that would lead to its repeal if only it were more generally and widely enforced." *Furman* v. *Georgia*, 408 U. S. 238, 386 (1972) (Burger, C. J., dissenting). We now know that any inference of a societal consensus rejecting the death penalty would have been mistaken. But had this Court then declared the existence of such a consensus, and outlawed capital punishment, legislatures would very likely not have been able to revive it. The mistaken premise of the decision would have been frozen into constitutional law, making it difficult to refute and even more difficult to reject.

The step that the plurality would take today is much narrower in scope, but it could conceivably reflect an error similar to the one we were urged to make in *Furman*. The day may come when we must decide whether a legislature may deliberately and unequivocally resolve upon a policy authorizing capital punishment for crimes committed at the age of 15. In that event, we shall have to decide the Eighth Amendment issue that divides the plurality and the dissent in this case, and we shall have to evaluate the evidence of societal standards of decency that is available to us at that time. In my view, however, we need not and should not decide the question today.

856

## II

Under the Eighth Amendment, the death penalty has been treated differently from all other punishments. See, *e. g.*, *California* v. *Ramos*, 463 U. S. 992, 998–999, and n. 9 (1983). Among the most important and consistent themes in this Court's death penalty jurisprudence is the need for special care and deliberation in decisions that may lead to the imposition of that sanction. The Court has accordingly imposed a series of unique substantive and procedural restrictions designed to ensure that capital punishment is not imposed without the serious and calm reflection that ought to precede any decision of such gravity and finality.

The restrictions that we have required under the Eighth Amendment affect both legislatures and the sentencing authorities responsible for decisions in individual cases. Neither automatic death sentences for certain crimes, for example, nor statutes committing the sentencing decision to the unguided discretion of judges or juries, have been upheld. See, *e. g.*, *Woodson* v. *North Carolina*, 428 U. S. 280 (1976); *Roberts* v. *Louisiana*, 428 U. S. 325 (1976); *Gregg* v. *Georgia*, 428 U. S. 153, 188–189 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.) (discussing *Furman* v. *Georgia, supra*). We have rejected both legislative restrictions on the mitigating evidence that a sentencing authority may consider, *e. g.*, *Lockett* v. *Ohio*, 438 U. S. 586 (1978); *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), and the lack of sufficiently precise restrictions on the aggravating circumstances that may be considered, *e. g.*, *Godfrey* v. *Georgia*, 446 U. S. 420 (1980). As a practical matter we have virtually required that the death penalty be imposed only when a guilty verdict has been followed by separate trial-like sentencing proceedings, and we have extended many of the procedural restrictions applicable during criminal trials into these proceedings. See, *e. g.*, *Gardner* v. *Florida*, 430 U. S. 349 (1977); *Estelle* v. *Smith*, 451 U. S. 454 (1981); *Bullington* v. *Missouri*, 451 U. S. 430

(1981). Legislatures have been forbidden to authorize capital punishment for certain crimes. *Coker* v. *Georgia*, 433 U. S. 584 (1977); *Enmund* v. *Florida*, 458 U. S. 782 (1982); see also *Ford* v. *Wainwright*, 477 U. S. 399 (1986) (Eighth Amendment forbids the execution of insane prisoners). Constitutional scrutiny in this area has been more searching than in the review of noncapital sentences. See *Enmund* v. *Florida*, *supra*, at 815, n. 27 (O'CONNOR, J., dissenting); *Rummel* v. *Estelle*, 445 U. S. 263, 272 (1980).

The case before us today raises some of the same concerns that have led us to erect barriers to the imposition of capital punishment in other contexts. Oklahoma has enacted a statute that authorizes capital punishment for murder, without setting any minimum age at which the commission of murder may lead to the imposition of that penalty. The State has also, but quite separately, provided that 15-year-old murder defendants may be treated as adults in some circumstances. Because it proceeded in this manner, there is a considerable risk that the Oklahoma Legislature either did not realize that its actions would have the effect of rendering 15-year-old defendants death eligible or did not give the question the serious consideration that would have been reflected in the explicit choice of some minimum age for death eligibility. Were it clear that no national consensus forbids the imposition of capital punishment for crimes committed before the age of 16, the implicit nature of the Oklahoma Legislature's decision would not be constitutionally problematic. In the peculiar circumstances we face today, however, the Oklahoma statutes have presented this Court with a result that is of very dubious constitutionality, and they have done so without the earmarks of careful consideration that we have required for other kinds of decisions leading to the death penalty. In this unique situation, I am prepared to conclude that petitioner and others who were below the age of 16 at the time of their offense may not be executed under the authority of a capital punishment statute that specifies no mini-

mum age at which the commission of a capital crime can lead to the offender's execution.*

The conclusion I have reached in this unusual case is itself unusual. I believe, however, that it is in keeping with the principles that have guided us in other Eighth Amendment cases. It is also supported by the familiar principle—applied in different ways in different contexts—according to which we should avoid unnecessary, or unnecessarily broad, constitutional adjudication. See generally, e. g., Ashwander v. TVA, 297 U. S. 288, 341–356 (1936) (Brandeis, J., concurring). The narrow conclusion I have reached in this case is consistent with the underlying rationale for that principle, which was articulated many years ago by Justice Jackson: "We are not final because we are infallible, but we are infallible only because we are final." Brown v. Allen, 344 U. S. 443, 540 (1953) (opinion concurring in result); see also Califano v. Yamasaki, 442 U. S. 682, 692–693 (1979). By leaving open for now the broader Eighth Amendment question that both the plurality and the dissent would resolve, the approach I take allows the ultimate moral issue at stake in the constitutional question to be addressed in the first in-

---

*Contrary to the dissent's suggestion, the conclusion I have reached in this case does not imply that I would reach a similar conclusion in cases involving "those of extremely low intelligence, or those over 75, or any number of other appealing groups as to which the existence of a national consensus regarding capital punishment may be in doubt . . . because they are not specifically named in the capital statutes." See post, at 877. In this case, there is significant affirmative evidence of a national consensus forbidding the execution of defendants who were below the age of 16 at the time of the offense. The evidence includes 18 state statutes setting a minimum age of 16 or more, and it is such evidence—not the mere failure of Oklahoma to specify a minimum age or the "appealing" nature of the group to which petitioner belongs—that leaves me unwilling to conclude that petitioner may constitutionally be executed. Cases in which similarly persuasive evidence was lacking would in my view not be analogous to the case before us today. The dissent is mistaken both when it reads into my discussion a contrary implication and when it suggests that there are ulterior reasons behind the implication it has incorrectly drawn.

stance by those best suited to do so, the people's elected representatives.

For the reasons stated in this opinion, I agree that petitioner's death sentence should be vacated, and I therefore concur in the judgment of the Court.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

If the issue before us today were whether an automatic death penalty for conviction of certain crimes could be extended to individuals younger than 16 when they commit the crimes, thereby preventing individualized consideration of their maturity and moral responsibility, I would accept the plurality's conclusion that such a practice is opposed by a national consensus, sufficiently uniform and of sufficiently long standing, to render it cruel and unusual punishment within the meaning of the Eighth Amendment. We have already decided as much, and more, in *Lockett* v. *Ohio*, 438 U. S. 586 (1978). I might even agree with the plurality's conclusion if the question were whether a person under 16 when he commits a crime can be deprived of the benefit of a rebuttable presumption that he is not mature and responsible enough to be punished as an adult. The question posed here, however, is radically different from both of these. It is whether there is a national consensus that no criminal so much as one day under 16, after individuated consideration of his circumstances, including the overcoming of a presumption that he should not be tried as an adult, can possibly be deemed mature and responsible enough to be punished with death for any crime. Because there seems to me no plausible basis for answering this last question in the affirmative, I respectfully dissent.

I

I begin by restating the facts since I think that a fuller account of William Wayne Thompson's participation in the murder, and of his certification to stand trial as an adult,

is helpful in understanding the case. The evidence at trial left no doubt that on the night of January 22–23, 1983, Thompson brutally and with premeditation murdered his former brother-in-law, Charles Keene, the motive evidently being, at least in part, Keene's physical abuse of Thompson's sister. As Thompson left his mother's house that evening, in the company of three older friends, he explained to his girl-friend that "we're going to kill Charles." Several hours later, early in the morning of January 23, a neighbor, Malcolm "Possum" Brown, was awakened by the sound of a gun-shot on his front porch. Someone pounded on his front door shouting: "Possum, open the door, let me in. They're going to kill me." Brown telephoned the police, and then opened the front door to see a man on his knees attempting to repel blows with his arms and hands. There were four other men on the porch. One was holding a gun and stood apart, while the other three were hitting and kicking the kneeling man, who never attempted to hit back. One of them was beating the victim with an object 12 to 18 inches in length. The police called back to see if the disturbance was still going on, and while Brown spoke with them on the telephone the men took the victim away in a car.

Several hours after they had left Thompson's mother's house, Thompson and his three companions returned. Thompson's girlfriend helped him take off his boots, and heard him say: "[W]e killed him. I shot him in the head and cut his throat and threw him in the river." Subsequently, the former wife of one of Thompson's accomplices heard Thompson tell his mother that "he killed him. Charles was dead and Vicki didn't have to worry about him anymore." During the days following the murder Thompson made other admissions. One witness testified that she asked Thompson the source of some hair adhering to a pair of boots he was carrying. He replied that was where he had kicked Charles Keene in the head. Thompson also told her that he had cut Charles' throat and chest and had shot him in the head. An-

other witness testified that when she told Thompson that a friend had seen Keene dancing in a local bar, Thompson remarked that that would be hard to do with a bullet in his head. Ultimately, one of Thompson's codefendants admitted that after Keene had been shot twice in the head Thompson had cut Keene "so the fish could eat his body." Thompson and a codefendant had then thrown the body into the Washita River, with a chain and blocks attached so that it would not be found. On February 18, 1983, the body was recovered. The Chief Medical Examiner of Oklahoma concluded that the victim had been beaten, shot twice, and that his throat, chest, and abdomen had been cut.

On February 18, 1983, the State of Oklahoma filed an information and arrest warrant for Thompson, and on February 22 the State began proceedings to allow Thompson to be tried as an adult. Under Oklahoma law, anyone who commits a crime when he is under the age of 18 is defined to be a child, unless he is 16 or 17 and has committed murder or certain other specified crimes, in which case he is automatically certified to stand trial as an adult. Okla. Stat., Tit. 10, §§ 1101, 1104.2 (Supp. 1987). In addition, under the statute the State invoked in the present case, juveniles may be certified to stand trial as adults if: (1) the State can establish the "prosecutive merit" of the case, and (2) the court certifies, after considering six factors, that there are no reasonable prospects for rehabilitation of the child within the juvenile system. Okla. Stat., Tit. 10, § 1112(b) (1981).

At a hearing on March 29, 1983, the District Court found probable cause to believe that the defendant had committed first-degree murder and thus concluded that the case had prosecutive merit. A second hearing was therefore held on April 21, 1983, to determine whether Thompson was amenable to the juvenile system, or whether he should be certified to stand trial as an adult. A clinical psychologist who had examined Thompson testified at the second hearing that in her opinion Thompson understood the difference between

right and wrong but had an antisocial personality that could not be modified by the juvenile justice system. The psychologist testified that Thompson believed that because of his age he was beyond any severe penalty of the law, and accordingly did not believe there would be any severe repercussions from his behavior. Numerous other witnesses testified about Thompson's prior abusive behavior. Mary Robinson, an employee of the Oklahoma juvenile justice system, testified about her contacts with Thompson during several of his previous arrests, which included arrests for assault and battery in August 1980; assault and battery in October 1981; attempted burglary in May 1982; assault and battery with a knife in July 1982; and assault with a deadly weapon in February 1983. She testified that Thompson had been provided with all the counseling the State's Department of Human Services had available, and that none of the counseling or placements seemed to improve his behavior. She recommended that he be certified to stand trial as an adult. On the basis of the foregoing testimony, the District Court filed a written order certifying Thompson to stand trial as an adult. That was appealed and ultimately affirmed by the Oklahoma Court of Criminal Appeals.

Thompson was tried in the District Court of Grady County between December 4 and December 9, 1983. During the guilt phase of the trial, the prosecutor introduced three color photographs showing the condition of the victim's body when it was removed from the river. The jury found Thompson guilty of first-degree murder. At the sentencing phase of the trial, the jury agreed with the prosecution on the existence of one aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel." As required by our decision in *Eddings* v. *Oklahoma*, 455 U. S. 104, 115–117 (1982), the defense was permitted to argue to the jury the youthfulness of the defendant as a mitigating factor. The jury recommended that the death penalty be imposed, and the trial judge, accordingly, sentenced Thompson to death.

Thompson appealed, and his conviction and capital sentence were affirmed. Standing by its earlier decision in *Eddings* v. *State*, 616 P. 2d 1159, 1166–1167 (1980), rev'd on other grounds, 455 U. S. 104 (1982), the Oklahoma Court of Criminal Appeals held that "once a minor is certified to stand trial as an adult, he may also, without violating the Constitution, be punished as an adult." 724 P. 2d 780, 784 (1986). It also held that admission of two of the three photographs was error in the guilt phase of the proceeding, because their prejudicial effect outweighed their probative value; but found that error harmless in light of the overwhelming evidence of Thompson's guilt. It held that their prejudicial effect did not outweigh their probative value in the sentencing phase, and that they were therefore properly admitted, since they demonstrated the brutality of the crime. Thompson petitioned for certiorari with respect to both sentencing issues, and we granted review. 479 U. S. 1084 (1987).

## II

### A

As the foregoing history of this case demonstrates, William Wayne Thompson is not a juvenile caught up in a legislative scheme that unthinkingly lumped him together with adults for purposes of determining that death was an appropriate penalty for him and for his crime. To the contrary, Oklahoma first gave careful consideration to whether, in light of his young age, he should be subjected to the normal criminal system at all. That question having been answered affirmatively, a jury then considered whether, despite his young age, his maturity and moral responsibility were sufficiently developed to justify the sentence of death. In upsetting this particularized judgment on the basis of a constitutional absolute, the plurality pronounces it to be a fundamental principle of our society that no one who is as little as one day short of his 16th birthday can have sufficient maturity and moral responsibility to be subjected to capital punishment for any

crime. As a sociological and moral conclusion that is implausible; and it is doubly implausible as an interpretation of the United States Constitution.

The text of the Eighth Amendment, made applicable to the States by the Fourteenth, prohibits the imposition of "cruel and unusual punishments." The plurality does not attempt to maintain that this was originally understood to prohibit capital punishment for crimes committed by persons under the age of 16; the evidence is unusually clear and unequivocal that it was not. The age at which juveniles could be subjected to capital punishment was explicitly addressed in Blackstone's Commentaries on the Laws of England, published in 1769 and widely accepted at the time the Eighth Amendment was adopted as an accurate description of the common law. According to Blackstone, not only was 15 above the age (viz., 7) at which capital punishment could theoretically be imposed; it was even above the age (14) up to which there was a rebuttable presumption of incapacity to commit a capital (or any other) felony. 4 W. Blackstone, Commentaries *23–*24. See also M. Hale, Pleas of the Crown *22 (describing the age of absolute incapacity as 12 and the age of presumptive incapacity as 14); Kean, The History of the Criminal Liability of Children, 53 L.Q. Rev. 364, 369–370 (1937); Streib, Death Penalty for Children: The American Experience with Capital Punishment for Crimes Committed While under Age Eighteen, 36 Okla. L. Rev. 613, 614–615 (1983) (hereinafter Streib, Death Penalty for Children). The historical practice in this country conformed with the common-law understanding that 15-year-olds were not categorically immune from commission of capital crimes. One scholar has documented 22 executions, between 1642 and 1899, for crimes committed under the age of 16. See Streib, Death Penalty for Children 619.

Necessarily, therefore, the plurality seeks to rest its holding on the conclusion that Thompson's punishment as an adult is contrary to the "evolving standards of decency that

mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion) (Warren, C. J.). *Ante*, at 821. Of course, the risk of assessing evolving standards is that it is all too easy to believe that evolution has culminated in one's own views. To avoid this danger we have, when making such an assessment in prior cases, looked for objective signs of how today's society views a particular punishment. *Furman* v. *Georgia*, 408 U. S. 238, 277–279 (1972) (BRENNAN, J., concurring). See also *Woodson* v. *North Carolina*, 428 U. S. 280, 293 (1976) (plurality opinion) (Stewart, Powell, and STEVENS, JJ.); *Coker* v. *Georgia*, 433 U. S. 584, 593–597 (1977); *Enmund* v. *Florida*, 458 U. S. 782, 788–789 (1982). The most reliable objective signs consist of the legislation that the society has enacted. It will rarely if ever be the case that the Members of this Court will have a better sense of the evolution in views of the American people than do their elected representatives.

It is thus significant that, only four years ago, in the Comprehensive Crime Control Act of 1984, Pub. L. 98–473, 98 Stat. 2149, Congress expressly addressed the effect of youth upon the imposition of criminal punishment, and changed the law in precisely the opposite direction from that which the plurality's perceived evolution in social attitudes would suggest: It lowered from 16 to 15 the age at which a juvenile's case can, "in the interest of justice," be transferred from juvenile court to Federal District Court, enabling him to be tried and punished as an adult. 18 U. S. C. § 5032 (1982 ed., Supp. IV). This legislation was passed in light of Justice Department testimony that many juvenile delinquents were "cynical, street-wise, repeat offenders, indistinguishable, except for their age, from their adult criminal counterparts," Hearings on S. 829 before the Subcommittee on Criminal Law of the Senate Committee on the Judiciary, 98th Cong., 1st Sess., 551 (1983), and that in 1979 alone juveniles under the age of 15, *i. e.*, almost a year *younger* than Thompson, had committed a total of 206 homicides nationwide, more than

1,000 forcible rapes, 10,000 robberies, and 10,000 aggravated assaults. *Id.*, at 554. Since there are federal death penalty statutes[1] which have not been determined to be unconstitutional, adoption of this new legislation could at least theoretically result in the imposition of the death penalty upon a 15-year-old. There is, to be sure, no reason to believe that the Members of Congress had the death penalty specifically in mind; but that does not alter the reality of what federal law now on its face permits. Moreover, if it is appropriate to go behind the face of the statutes to the subjective intentions of those who enacted them, it would be strange to find the consensus regarding criminal liability of juveniles to be moving in the direction the plurality perceives for capital punishment, while moving in precisely the opposite direction for all other penalties.[2]

---

[1] See 10 U. S. C. § 906a (peacetime espionage); 10 U. S. C. § 918 (murder while member of Armed Forces); 18 U. S. C. §§ 32, 33, and 34 (1982 ed. and Supp. IV) (destruction of aircraft, motor vehicles, or related facilities resulting in death); 18 U. S. C. § 115(b)(3) (1982 ed., Supp. IV) (retaliatory murder of member of immediate family of law enforcement officials) (by cross reference to 18 U. S. C. § 1111); 18 U. S. C. § 351 (1982 ed. and Supp. IV) (murder of Member of Congress, important Executive official, or Supreme Court Justice) (by cross reference to 18 U. S. C. § 1111); 18 U. S. C. § 794 (espionage); 18 U. S. C. § 844(f) (1982 ed., Supp. IV) (destruction of government property resulting in death); 18 U. S. C. § 1111 (1982 ed. and Supp. IV) (first-degree murder within federal jurisdiction); 18 U. S. C. § 1716 (mailing of injurious articles with intent to kill resulting in death); 18 U. S. C. § 1751 (assassination or kidnaping resulting in death of President or Vice President) (by cross reference to 18 U. S. C. § 1111); 18 U. S. C. § 1992 (willful wrecking of train resulting in death); 18 U. S. C. § 2113 (bank robbery-related murder or kidnaping); 18 U. S. C. § 2381 (treason); 49 U. S. C. App. §§ 1472 and 1473 (death resulting from aircraft hijacking).

[2] The concurrence disputes the significance of Congress' lowering of the federal waiver age by pointing to a recently approved Senate bill that would set a minimum age of 18 before capital punishment could be imposed for certain narcotics-related offenses. This bill has not, however, been passed by the House of Representatives and signed into law by the President. Even if it eventually were, it would not result in the setting of a

Turning to legislation at the state level, one observes the same trend of *lowering* rather than raising the age of juvenile criminal liability.[3]   As for the state status quo with respect to the death penalty in particular: The plurality chooses to "confine [its] attention" to the fact that all 18 of the States that establish a minimum age for capital punishment have chosen at least 16.   *Ante,* at 829.   But it is beyond me why an accurate analysis would not include within the computa-

---

minimum age of 18 for any of the other federal death penalty statutes set forth in n. 1, *supra.*   It would simply reflect a judgment by Congress that the death penalty is inappropriate for juvenile narcotics offenders.   That would have minimal relevance to the question of consensus at issue here, which is not whether criminal offenders under 16 can be executed for *all* crimes, but whether they can be executed for *any* crimes.   For the same reason, there is no significance to the concurrence's observation that the Federal Government has by Treaty agreed to a minimum death penalty age in certain very limited circumstances.

[3] Compare S. Davis, Rights of Juveniles, App. B–1 to B–26 (1987), with S. Davis, Rights of Juveniles 233–249 (1974).   Idaho has twice lowered its waiver age, most recently from 15 to 14; Idaho Code § 16–1806 (Supp. 1988); Illinois has added as excluded offenses: murder, criminal sexual assault, armed robbery with a firearm, and possession of a deadly weapon in a school committed by a child 15 or older; Ill. Ann. Stat., ch. 37, § 805–4(6) (Supp. 1988); Indiana has lowered its waiver age to 14 where aggravating circumstances are present, and it has made waiver mandatory where child is 10 or older and has been charged with murder; Ind. Code §§ 31–6–2– 4(b)—(e) (Supp. 1987); Kentucky has established a waiver age of 14 for juveniles charged with capital offenses or Class A or B felonies; Ky. Rev. Stat. §§ 635.020(2)–(4), 640.010 (Supp. 1986); Minnesota has made waiver mandatory for offenses committed by children 14 years or older who were previously certified for criminal prosecution and convicted of the offense or a lesser included offense; Minn. Stat. § 260.125, subd. 1, 3, and 3a (1986); and Montana has lowered its waiver age from 16 to 12 for children charged with sexual intercourse without consent, deliberate homicide, mitigated deliberate homicide, or attempted deliberate homicide or attempted mitigated deliberate homicide; Mont. Code Ann. § 41–5–206(1)(a) (1987); New Jersey lowered its waiver age from 16 to 14 for certain aggravated offenses; N. J. Stat. Ann. § 2A:4A–26 (West 1987); and New York recently amended its law to allow certain 13-, 14- and 15-year-olds to be tried and punished as adults; N. Y. Crim. Proc. Law § 190.71 (McKinney 1982).

tion the larger number of States (19) that have determined that no minimum age for capital punishment is appropriate, leaving that to be governed by their general rules for the age at which juveniles can be criminally responsible. A survey of state laws shows, in other words, that a majority of the States for which the issue exists (the rest do not have capital punishment) are of the view that death is not different insofar as the age of juvenile criminal responsibility is concerned. And the latter age, while presumed to be 16 in all the States, see *ante*, at 824, can, in virtually all the States, be less than 16 when individuated consideration of the particular case warrants it. Thus, what Oklahoma has done here is precisely what the majority of capital-punishment States would do.

When the Federal Government, and almost 40% of the States, including a majority of the States that include capital punishment as a permissible sanction, allow for the imposition of the death penalty on any juvenile who has been tried as an adult, which category can include juveniles under 16 at the time of the offense, it is obviously impossible for the plurality to rely upon any evolved societal consensus discernible in legislation—or at least discernible in the legislation of *this* society, which is assuredly all that is relevant.[4] Thus, the

---

[4] The plurality's reliance upon Amnesty International's account of what it pronounces to be civilized standards of decency in other countries, *ante*, at 830–831, and n. 34, is totally inappropriate as a means of establishing the fundamental beliefs of this Nation. That 40% of our States do not rule out capital punishment for 15-year-old felons is determinative of the question before us here, even if that position contradicts the uniform view of the rest of the world. We must never forget that it is a Constitution for the United States of America that we are expounding. The practices of other nations, particularly other democracies, can be relevant to determining whether a practice uniform among our people is not merely a historical accident, but rather so "implicit in the concept of ordered liberty" that it occupies a place not merely in our mores but, text permitting, in our Constitution as well. See *Palko* v. *Connecticut*, 302 U. S. 319, 325 (1937) (Cardozo, J.). But where there is not first a settled consensus among our own people, the views of other nations, however enlightened the Justices of this Court may think them to be, cannot be imposed upon Americans

plurality falls back upon what it promises will be an examination of "the behavior of juries." *Ante*, at 831. It turns out not to be that, perhaps because of the inconvenient fact that no fewer than five murderers who committed their crimes under the age of 16 were sentenced to death, in five different States, between the years 1984 and 1986. V. Streib, Death Penalty for Juveniles 168–169 (1987). Instead, the plurality examines the statistics on capital executions, which are of course substantially lower than those for capital sentences because of various factors, most notably the exercise of executive clemency. See Streib, Death Penalty for Children 619. Those statistics show, unsurprisingly, that capital punishment for persons who committed crimes under the age of 16 is rare. We are not discussing whether the Constitution requires such procedures as will continue to cause it to be rare, but whether the Constitution prohibits it entirely. The plurality takes it to be persuasive evidence that social attitudes have changed to embrace such a prohibition—changed so clearly and permanently as to be irrevocably enshrined in the Constitution—that in this century all of the 18 to 20 executions of persons below 16 when they committed crimes occurred before 1948.

Even assuming that the execution rather than the sentencing statistics are the pertinent data, and further assuming that a 4-decade trend is adequate to justify calling a constitutional halt to what may well be a pendulum swing in social attitudes, the statistics are frail support for the existence of the *relevant* trend. There are many reasons that adequately account for the drop in excecutions other than the premise of general agreement that no 15-year-old murderer should ever be executed. Foremost among them, of course, was a reduc-

---

through the Constitution. In the present case, therefore, the fact that a majority of foreign nations would not impose capital punishment upon persons under 16 at the time of the crime is of no more relevance than the fact that a majority of them would not impose capital punishment at all, or have standards of due process quite different from our own.

tion in public support for capital punishment in general. Of the 14 States (including the District of Columbia) that currently have no death penalty statute, 11 have acquired that status since 1950. V. Streib, Death Penalty for Juveniles 42, Table 3–1. That reduction in willingness to impose capital punishment (which may reasonably be presumed to have been felt even in those States that did not entirely abolish it), combined with the modern trend, constitutionalized in *Lockett* v. *Ohio*, 438 U. S. 586 (1978), towards individualized sentencing determinations rather than automatic death sentences for certain crimes, reduced the total number of executions nationwide from an average of 1,272 per decade in the first half of the century to 254 per decade since then. See V. Streib, Death Penalty for Juveniles 56, Table 4–1. A society less ready to impose the death penalty, and entirely unwilling to impose it without individualized consideration, will of course pronounce death for a crime committed by a person under 16 very rarely. There is absolutely no basis, however, for attributing that phenomenon to a modern consensus that such an execution should never occur—any more than it would have been accurate to discern such a consensus in 1927 when, despite a level of total executions almost five times higher than that of the post-1950 period, there had been no execution for crime committed by juveniles under the age of 16 for almost 17 years. That that did not reflect a new societal absolute was demonstrated by the fact that in approximately the next 17 years there were 10 such executions. *Id.*, at 191–208.

In sum, the statistics of executions demonstrate nothing except the fact that our society has always agreed that executions of 15-year-old criminals should be rare, and in more modern times has agreed that they (like all other executions) should be even rarer still. There is no rational basis for discerning in that a societal judgment that no one so much as a day under 16 can *ever* be mature and morally responsible enough to deserve that penalty; and there is no justification

except our own predeliction for converting a statistical rarity of occurrence into an absolute constitutional ban. One must surely fear that, now that the Court has taken the first step of requiring individualized consideration in capital cases, today's decision begins a second stage of converting into constitutional rules the general results of that individuation. One could readily run the same statistical argument with respect to other classes of defendants. Between 1930 and 1955, for example, 30 women were executed in the United States. Only three were executed between then and 1986—and none in the 22-year period between 1962 and 1984. Proportionately, the drop is as impressive as that which the plurality points to in 15-year-old executions. (From 30 in 25 years to 3 in the next 31 years, versus from 18 in 50 years to potentially 1—the present defendant—in the next 40 years.) Surely the conclusion is not that it is unconstitutional to impose capital punishment upon a woman.[5]

If one believes that the data the plurality relies upon are effective to establish, with the requisite degree of certainty, a constitutional consensus in this society that no person can

---

[5] I leave to a footnote my discussion of the plurality's reliance upon the fact that in most or all States, juveniles under 16 cannot vote, sit on a jury, marry without parental consent, participate in organized gambling, patronize pool halls, pawn property, or purchase alcohol, pornographic materials, or cigarettes. *Ante*, at 823, 824, and nn. 10–14. Our cases sensibly suggest that constitutional rules relating to the maturity of minors must be drawn with an eye to the decision for which the maturity is relevant. See *Fare* v. *Michael C.*, 442 U. S. 707, 725–727 (1979) (totality of the circumstances test for juvenile waiver of Fifth Amendment rights permits evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him); *Bellotti* v. *Baird*, 443 U. S. 622, 634–637, 642 (1979) (abortion decision differs in important ways from other decisions that may be made during minority). It is surely constitutional for a State to believe that the degree of maturity that is necessary fully to appreciate the pros and cons of smoking cigarettes, or even of marrying, may be somewhat greater than the degree necessary fully to appreciate the pros and cons of brutally killing a human being.

ever be executed for a crime committed under the age of 16, it is difficult to see why the same judgment should not extend to crimes committed under the age of 17, or of 18. The frequency of such executions shows an almost equivalent drop in recent years, *id.*, at 191–208; and of the 18 States that have enacted age limits upon capital punishment, only 3 have selected the age of 16, only 4 the age of 17, and all the rest the age of 18, *ante*, at 829, n. 29. It seems plain to me, in other words, that there is no clear line here, which suggests that the plurality is inappropriately acting in a legislative rather than a judicial capacity. Doubtless at some age a line does exist — as it has always existed in the common law, see *supra*, at 864 — below which a juvenile can *never* be considered fully responsible for murder. The evidence that the views of our society, so steadfast and so uniform that they have become part of the agreed-upon laws that we live by, regard that absolute age to be 16 is nonexistent.

## B

Having avoided any attempt to justify its holding on the basis of the original understanding of what was "cruel and unusual punishment," and having utterly failed in justifying its holding on the basis of "evolving standards of decency" evidenced by "the work product of state legislatures and sentencing juries," *ante*, at 822, the plurality proceeds, in Part V of the opinion, to set forth its views regarding the desirability of ever imposing capital punishment for a murder committed by a 15-year-old. That discussion begins with the recitation of propositions upon which there is "broad agreement" within our society, namely, that "punishment should be directly related to the personal culpability of the criminal defendant," and that "adolescents as a class are less mature and responsible than adults." *Ante*, at 834. It soon proceeds, however, to the conclusion that "[g]iven the lesser culpability of the juvenile offender, the teenager's capacity for growth, and society's fiduciary obligations to its children," none of the

rationales for the death penalty can apply to the execution of a 15-year-old criminal, so that it is "'nothing more than the purposeless and needless imposition of pain and suffering.'" *Ante,* at 838, quoting *Coker* v. *Georgia,* 433 U. S., at 592. On this, as we have seen, there is assuredly not general agreement. Nonetheless, the plurality would make it one of the fundamental laws governing our society solely because it has an "'abiding conviction'" that it is so, *ante,* at 833, n. 40, quoting *Coker* v. *Georgia, supra,* at 598.

This is in accord with the proposition set out at the beginning of the plurality's discussion in Part V, that "'[a]lthough the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty.'" *Ante,* at 833, quoting *Enmund* v. *Florida,* 458 U. S., at 797. I reject that proposition in the sense intended here. It is assuredly "for us ultimately to judge" what the Eighth Amendment permits, but that means it is for us to judge whether certain punishments are forbidden because, despite what the current society thinks, they were forbidden under the original understanding of "cruel and unusual," cf. *Brown* v. *Board of Education,* 347 U. S. 483 (1954); or because they come within current understanding of what is "cruel and unusual," because of the "evolving standards of decency" *of our national society;* but not because they are out of accord with the perceptions of decency, or of penology, or of mercy, entertained—or strongly entertained, or even held as an "abiding conviction"—by a majority of the small and unrepresentative segment of our society that sits on this Court. On its face, the phrase "cruel *and unusual* punishments" limits the evolving standards appropriate for our consideration to those entertained by the society rather than those dictated by our personal consciences.

Because I think the views of this Court on the policy questions discussed in Part V of the plurality opinion to be irrelevant, I make no attempt to refute them. It suffices to say

that there is another point of view, suggested in the following passage written by our esteemed former colleague Justice Powell, whose views the plurality several times invokes for support, *ante*, at 823–825, 834:

> "Minors who become embroiled with the law range from the very young up to those on the brink of majority. Some of the older minors become fully 'street-wise,' hardened criminals, deserving no greater consideration than that properly accorded all persons suspected of crime." *Fare* v. *Michael C.*, 442 U. S. 707, 734, n. 4 (1979) (dissenting opinion).

The view that it is possible for a 15-year-old to come within this category uncontestably prevailed when the Eighth and Fourteenth Amendments were adopted, and, judging from the actions of the society's democratically elected representatives, still persuades a substantial segment of the people whose "evolving standards of decency" we have been appointed to discern rather than decree. It is not necessary, as the plurality's opinion suggests, that "we [be] persuaded," *ante*, at 838, of the correctness of the people's views.

## III

If I understand JUSTICE O'CONNOR's separate concurrence correctly, it agrees (1) that we have no constitutional authority to set aside this death penalty unless we can find it contrary to a firm national consensus that persons younger than 16 at the time of their crime cannot be executed, and (2) that we cannot make such a finding. It does not, however, reach the seemingly inevitable conclusion that (3) we therefore have no constitutional authority to set aside this death penalty. Rather, it proceeds (in Part II) to state that since (a) we have treated the death penalty "differently from all other punishments," *ante*, at 856, imposing special procedural and substantive protections not required in other contexts, and (b) although we cannot actually *find* any national consensus forbidding execution for crimes committed under 16, there

may *perhaps* be such a consensus, therefore (c) the Oklahoma statutes plainly authorizing the present execution by treating 15-year-old felons (after individuated findings) as adults, and authorizing execution of adults, are not adequate, and what is needed is a statute explicitly stating that "15-year-olds can be guilty of capital crimes."

First, of course, I do not agree with (b)—that there is any doubt about the nonexistence of a national consensus. The concurrence produces the doubt only by arbitrarily refusing to believe that what the laws of the Federal Government and 19 States clearly provide for represents a "considered judgment." *Ante*, at 852. Second, I do not see how (c) follows from (b)—how the problem of doubt about whether what the Oklahoma laws permit is contrary to a firm national consensus and therefore unconstitutional is solved by making *absolutely sure* that the citizens of Oklahoma really want to take this unconstitutional action. And finally, I do not see how the procedural and substantive protections referred to in (a) provide any precedent for what is done in (c). Those special protections for capital cases, such as the prohibition of unguided discretion, *Gregg* v. *Georgia*, 428 U. S. 153, 176–196 (1976) (joint opinion) (Stewart, Powell, and STEVENS, JJ.) and the prohibition of automatic death sentences for certain crimes, *Woodson* v. *North Carolina*, 428 U. S., at 289–301 (plurality opinion) (Stewart, Powell, and STEVENS, JJ.), were not drawn from a hat, but were thought to be (once again) what a national consensus required. I am unaware of any national consensus, and the concurrence does not suggest the existence of any, that the death penalty for felons under 16 can only be imposed by a single statute that explicitly addresses that subject. Thus, part (c) of the concurrence's argument, its conclusion, could be replaced with almost anything. There is no more basis for imposing the particular procedural protection it announces than there is for imposing a requirement that the death penalty for felons under 16 be adopted by a two-thirds vote of each house of the

state legislature, or by referendum, or by bills printed in 10-point type. I am also left in some doubt whether this new requirement will be lifted (since its supposed rationale would disappear) when enough States have complied with it to render the nonexistence of a national consensus against such executions no longer doubtful; or only when enough States have done so to demonstrate that there is a national consensus in favor of such executions; or never.

It could not possibly be the concurrence's concern that this death sentence is a fluke—a punishment not really contemplated by Oklahoma law but produced as an accidental result of its interlocking statutes governing capital punishment and the age for treating juveniles as adults. The statutes, and their consequences, are quite clear. The present case, moreover, is of such prominence that it has received extensive coverage not only in the Oklahoma press but nationally. It would not even have been necessary for the Oklahoma Legislature to act in order to remedy the miscarriage of its intent, if that is what this sentence was. The Governor of Oklahoma, who can certainly recognize a frustration of the will of the citizens of Oklahoma more readily than we, would certainly have used his pardon power if there was some mistake here. What the concurrence proposes is obviously designed to nullify rather than effectuate the will of the people of Oklahoma, even though the concurrence cannot find that will to be unconstitutional.

What the concurrence proposes is also designed, of course, to make it more difficult for all States to enact legislation resulting in capital punishment for murderers under 16 when they committed their crimes. It is difficult to pass a law saying explicitly "15-year-olds can be executed," just as it would be difficult to pass a law saying explicitly "blind people can be executed," or "white-haired grandmothers can be executed," or "mothers of two-year-olds can be executed." But I know of no authority whatever for our specifying the precise form that state legislation must take, as opposed to its constitu-

tionally required content. We have in the past studiously avoided that sort of interference in the States' legislative processes, the heart of their sovereignty. Placing restraints upon the manner in which the States make their laws, in order to give 15-year-old criminals special protection against capital punishment, may well be a good idea, as perhaps is the abolition of capital punishment entirely. It is not, however, an idea it is ours to impose. Thus, while the concurrence purports to be adopting an approach more respectful of States' rights than the plurality, in principle it seems to me much more disdainful. It says to those jurisdictions that have laws like Oklahoma's: We cannot really say that what you are doing is contrary to national consensus and therefore unconstitutional, but since we are not entirely sure you must in the future legislate in the manner that we say.

In my view the concurrence also does not fulfill its promise of arriving at a more "narrow conclusion" than the plurality, and avoiding an "unnecessarily broad" constitutional holding. *Ante*, at 858. To the contrary, I think it hoists on to the deck of our Eighth Amendment jurisprudence the loose cannon of a brand new principle. If the concurrence's view were adopted, henceforth a finding of national consensus would no longer be required to invalidate state action in the area of capital punishment. All that would be needed is uncertainty regarding the existence of a national consensus, whereupon various protective requirements could be imposed, even to the point of specifying the process of legislation. If 15-year-olds must be explicitly named in capital statutes, why not those of extremely low intelligence, or those over 75, or any number of other appealing groups as to which the existence of a national consensus regarding capital punishment may be in doubt for the same reason the concurrence finds it in doubt here, viz., because they are not specifically named in the capital statutes? Moreover, the motto that "death is different" would no longer mean that the firm view of our society demands that it be treated differently in certain identifiable re-

spects, but rather that this Court can attach to it whatever limitations seem appropriate. I reject that approach, and would prefer to it even the misdescription of what constitutes a national consensus favored by the plurality. The concurrence's approach is a Solomonic solution to the problem of how to prevent execution in the present case while at the same time not holding that the execution of those under 16 when they commit murder is categorically unconstitutional. Solomon, however, was not subject to the constitutional constraints of the judicial department of a national government in a federal, democratic system.

## IV

Since I find Thompson's age inadequate grounds for vacating his sentence, I must reach the question whether the Constitution was violated by permitting the jury to consider in the sentencing stage the color photographs of Charles Keene's body. Thompson contends that this rendered his sentencing proceeding so unfair as to deny him due process of law.

The photographs in question, showing gunshot wounds in the head and chest, and knife slashes in the throat, chest and abdomen, were certainly probative of the aggravating circumstance that the crime was "especially heinous, atrocious, or cruel." The only issue, therefore, is whether they were unduly inflammatory. We have never before held that the excessively inflammatory character of concededly relevant evidence can form the basis for a constitutional attack, and I would decline to do so in this case. If there is a point at which inflammatoriness so plainly exceeds evidentiary worth as to violate the federal Constitution, it has not been reached here. The balancing of relevance and prejudice is generally a state evidentiary issue, which we do not sit to review. *Lisenba* v. *California*, 314 U. S. 219, 227–228 (1941).

For the foregoing reasons, I respectfully dissent from the judgment of the Court.